576 A.2d 79

David M. BARASCH, Consumer Advocate, Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

PENNSYLVANIA COALITION AGAINST DOMESTIC
VIOLENCE and Mary Jane Isenberg, Petitioners,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Barry STEINHARDT, The American Civil Liberties Union of
Pennsylvania, Petitioners,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

CONSUMER EDUCATION AND PROTECTIVE
ASSOCIATION and Carol Walton, Petitioners,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Feb. 7, 1990.

Decided May 30, 1990.

Joint Application for Limited Reargument
Denied July 17, 1990.

Daniel Clearfield, with him, Irwin A. Popowsky, Sr. Asst. Consumer Advocates, Harrisburg, for petitioner, David M. Barasch, Consumer Advocate.

David T. Kluz, Harrisburg, for petitioners, Pennsylvania Coalition Against Domestic Violence and Mary Jane Isenberg.

Scott Burris, Philadelphia, for petitioners, Barry Steinhardt and The American Civil Liberties Union of Pennsylvania.

Steven P. Hershey, Philadelphia, for petitioners, Consumer Educ. and Protective Ass'n and Carol Walton.

John A. Levin, Asst. Counsel, with him, Bohdan R. Pankiw, First Deputy Chief Counsel, and John F. Povilaitis, Chief Counsel, for respondent, Pennsylvania Public Utility Com'n.

Irving R. Segal, with him, Gerard J. St. John, Schnader, Harrison, Segal & Lewis, and James G. Pachulski, Julia A. Conover, Daniel E. Monagle and D. Michael Stroud, Philadelphia, for intervenor, The Bell Telephone Co. of Pennsylvania.

Ernest D. Preate, Jr., Attorney General, with him, Walter W. Cohen, First Deputy Atty. Gen., and Robert A. Graci, Chief Deputy Atty. Gen., for amicus curiae, Atty. Gen. of Pa.

Lloyd R. Persun, Mette, Evans & Woodside, Harrisburg, for amicus curiae, MCI Telecommunications Corp. (MCI).

Before CRUMLISH, Jr., President Judge, and CRAIG, McGINLEY, SMITH and PELLEGRINI, JJ.

SMITH, Judge.

This matter comes before the Court on a petition for review of the November 9, 1989 order entered by the Pennsylvania Public Utility Commission (Commission) which rejected the Recommended Decision of Administrative Law Judge Michael Schnierle (ALJ) and approved the use of a customer service reintroduced by Bell of Pennsylvania (Bell)[1] identified as Caller*ID. This service would permit customers to identify the telephone number from which a call is being made to the customer and is to be offered with limited blocking for private, nonprofit, tax-exempt domestic violence intervention agencies; home telephones of staff members of such agencies whose personal safety may be at risk if blocking is not provided and who are certified to require blocking service by the agency head; federal, state and local law enforcement agencies; and persons for whom a duly authorized representative of federal, state and local law enforcement agencies have certified a need for blocking to mitigate the risk of personal injury.

The Commission concluded that by implementing Caller*ID, lives can be saved; annoying, harassing, abusive,

---

**1.** References to Bell's arguments throughout this opinion are generally considered to be those of Bell and Respondent Commission jointly.

obscene and terroristic telephone calls can be curtailed; false bomb threats to public schools, false fire alarms and other harassing and life threatening prank calls may be eliminated or reduced; and residential callers will have their privacy better safeguarded. Petitioners filed complaints before the Commission against the proposed Caller*ID service. On December 29, 1989, this Court granted Petitioners' joint application for partial stay of the Commission order and directed that Caller*ID be offered only to emergency service providers pending final disposition of Petitioners' appeal.

■ Multiple issues are presented for review, including questions as to whether the use of Caller*ID without a blocking mechanism constitutes a violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act (Wiretap Act);[2] whether authorization of Caller*ID by the Commission without a blocking mechanism constitutes a violation of privacy rights protected by the Pennsylvania and U.S. Constitutions; whether the Commission's order requiring limited blocking violates due process and is unlawfully discriminatory where the certification procedure ordered by the Commission lacks procedural safeguards; and finally, whether the Commission's order is supported by substantial evidence of record. The scope of review in this matter is limited to determining whether or not the Commission violated any constitutional rights, committed an error of law, or made findings which are not supported by substantial evidence. *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission*, 83 Pa.Commonwealth Ct. 331, 478 A.2d 921 (1984), *appeal dismissed as improvidently granted*, 518 Pa. 76, 541 A.2d 314 (1988); 2 Pa. C.S. § 704 (Supp.1989).

## I.

Bell filed its revision to Tariff Pa. PUC No. 1 on June 18, 1989 in which Bell proposed new services to its tariff. The

2. 18 Pa. C.S. §§ 5701–5781.

filing by Bell proposed to merge existing Customer Calling Service and Customer Local Area Signalling Service tariffs into a unified tariff labeled Bell Atlantic I.Q. Services Family, or services sold primarily to the residential and small business market. ALJ Recommended Decision (R. Decision), pp. 2, 9.[3] Included in this filing is the following description of Caller*ID:

> This service allows a customer to receive the calling telephone number for calls placed to the customer. The calling telephone number will be forwarded from the terminating central office to a customer provided telephone number display device attached to the customer's telephone line. The calling telephone number will be delivered during the first silent interval of ringing. The telephone numbers which will be forwarded to the customer will include telephone numbers associated with private telephone number service and non-listed telephone number service, as described elsewhere in this tariff. For calls originating from a line within a multi-line hunting of four-party service, only the 'main' or 'pilot' telephone number will be delivered. A message indicating the unavailability of a calling telephone number will be

**3.** Within the I.Q. Family is a subgroup of services called CLASS Services which include Caller*ID, Call*Return, Call*Block, and Call*Trace. None of the other class services require that the called party know the telephone number of the calling party.

"Call*Return" permits a customer to return the last incoming call without knowing who made the call by dialing a particular code and the central office equipment then reclaims the calling party's number from memory and uses it to initiate call back.

"Call*Block" allows a customer to create a screening list in the telephone company's equipment which can be used to compare calling parties' telephone numbers. If a calling number matches a number on the screening list, the call is not completed to the called party.

"Call*Trace" allows a customer to dial a code to forward the calling party's telephone number to the telephone company's Annoyance Call Bureau. The code allows the system to take the calling party's number and store it in a memory register associated with the telephone line called. The calling party's number is then routed to the Annoyance Call Bureau.

The monthly subscription rate is $6.50 for Caller*ID; $2.50 for Call*Return; $5.00 for Call*Block; and $1.00 per activation or usage rate for Call*Trace. ALJ R. Decision, pp. 10–17, 23.

forwarded if the call originates from a telephone service which is not located in an appropriately equipped office. Caller*ID is available to individual line customers by monthly subscription, which provides unlimited use of the service.

Commission Order, p. 2. Caller*ID would not permit customers to identify the telephone number for calls being made from a pay telephone, by credit card, or by operator assistance.

On September 22, 1989, the ALJ issued his Recommended Decision finding that Caller*ID was not in the public interest unless Bell provided a "per-call" blocking option which is already built into the system. Bell's proposal did not include the blocking option recommended by the ALJ which would permit customers to block transmission of their telephone numbers prior to placing a call. The ALJ determined that Caller*ID was a "trap and trace device" as defined by the Wiretap Act and that only by offering the blocking mechanism could Caller*ID become lawful under that statute.

The Commission entered its order on November 9, 1989 rejecting the ALJ's Recommended Decision and permitting Bell to provide Caller*ID to its customers, but with the added requirement that Bell provide free subscription or per-call blocking at the customers' discretion for (a) private, non-profit, tax-exempt, domestic violence intervention agencies; (b) home telephones of staff members of such agencies whose personal safety may be at risk although such individuals must be certified by the head of the agency and re-certified annually; (c) federal, state and local law enforcement agencies; and (d) individuals for whom a duly authorized representative of a federal, state or local law enforcement agency has certified a need for blocking to reduce the risk of personal injury. Such individuals must also be recertified annually. The Commission did not order that blocking be made available for any other individuals. Bell filed a new tariff on November 18, 1989 in compliance

with the Commission's order, and this tariff was approved by the Commission on November 30, 1989.

## II.

Initially, Petitioners argue that Caller*ID violates Section 5771(a) of the Wiretap Act, 18 Pa. C.S. § 5771(a), which states as follows:

> (a) General Rule.—Except as provided in this section, no person may install or use a pen register or a trap and trace device without first obtaining a court order under section 5773 (relating to issuance of an order for a pen register or a trap and trace device).

Section 5702, 18 Pa. C.S. § 5702, defines a trap and trace device as:

> [a] device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted.

The Wiretap Act does however except certain forms of transmission from its provisions:

> (b) Exception.—The prohibition of subsection (a) does not apply with respect to the use of a pen register or a trap and trace device by a provider of electronic or wire communication service:
>
> > (1) relating to the operation, maintenance and testing of a wire or electronic communication service or to the protection of the rights or property of the provider, or to the protection of users of the service from abuse of service or unlawful use of service; or
> >
> > (2) to record the fact that a wire or electronic communication was initiated or completed in order to protect the provider, another provider furnishing service toward the completion of the wire communication or a user of the service from fraudulent, unlawful or abusive use of service, or with the consent of the user of the service.

18 Pa. C.S. § 5771(b).

An historical perspective upon enactment of Pennsylvania's Wiretap Act will be useful for this discussion.

The initial history of anti-wiretapping legislation is de-scribed in part by the Supreme Court in *Commonwealth v. Murray*, 423 Pa. 37, 43, 223 A.2d 102, 105 (1966), and its observations are illuminating:

> When the Pennsylvania [anti-wiretapping] Act passed the State Senate, the prohibition read: 'No person shall inter-cept a communication by telephone or telegraph without permission of *one* of the parties.' ... However, this restriction to the consent of only one party was decisively rejected in the House by a vote of 128 to 61. The bill was then amended to provide for the consent of all *parties* to the communication before the interception could be de-fended. [Emphasis in original.]

Thus, enactment of the Wiretap Act, most recently amended October 21, 1988, was intended to develop a means for the prohibition of nonconsensual interception of wire, oral or electronic communication except where authorized by the statute. *See Commonwealth v. Melilli*, 521 Pa. 405, 555 A.2d 1254 (1989). Dissenting Commissioner Joseph Rhodes, Jr., a former legislator who in 1977 chaired the House Judiciary Sub-Committee on Crime and Corrections and jointly introduced the Wiretap Act, indicated that the funda-mental purpose behind enactment of the legislation was to minimize interceptions of telephone conversations and num-bers. Commission Dissenting Opinion, pp. 4–6. Moreover, the Wiretap Act prohibits even a private individual from recording his or her own telephone conversation unless that individual has the consent of all parties to the conversation. *Commonwealth v. Jung*, 366 Pa.Superior Ct. 438, 531 A.2d 498 (1987).

Further, the General Assembly has provided protection to telephone numbers through enactment of the Wiretap Act by prohibiting the use of interception devices unless proba-ble cause exists. 18 Pa. C.S. § 5773. In *Commonwealth v. Beauford*, 327 Pa.Superior Ct. 253, 475 A.2d 783 (1984), *appeal dismissed as improvidently granted*, 508 Pa. 319, 496 A.2d 1143 (1985), although involving the use of pen registers and dialed number recorders by law enforcement

officials, the Supreme Court unequivocally stated that telephone numbers are to be afforded protection. In *Melilli*, the Supreme Court reaffirmed its position in *Beauford*:

> In *Beauford*, the Superior Court intended to equate telephone numbers with other forms of telephone communication which are regarded as private. Telephone activities are largely of one piece, and efforts to create distinctions between numbers and conversational content are constitutionally untenable in our view.

*Melilli*, 521 Pa. at 414, 555 A.2d at 1259.

■ Petitioners argue that Caller\*ID meets the definition of a trap and trace device prohibited by the Wiretap Act which clearly provides that use of a trap and trace device may only be conducted by an electronic service provider and not by individual customers to whom Bell wishes to offer this new class of service. They also invoke the general provision of the Wiretap Act prohibiting the interception or disclosure of electronic communications. 18 Pa. C.S. § 5703. Bell's response is that Caller\*ID does not constitute a trap and trace device nor an unlawful interception of electronic communications and further that the Wiretap Act is a criminal statute and must be narrowly construed. By applying this strict standard, according to Bell, it becomes apparent that the Wiretap Act does not prohibit the use of Caller\*ID. Bell also asserts that the Wiretap Act applies only to third party interception and is designed to regulate surreptitious electronic surveillance of citizens by governmental officials and not to prohibit such surveillance by private individuals, and as such, no legislative prohibition exists against Caller\*ID which Bell suggests is nothing more than routine telephone service offered by Bell in the course of its doing business. Bell's interpretation of the Wiretap Act is simply incorrect inasmuch as unlawful interception can occur in the use of Caller\*ID and private individuals may be prosecuted for violation of any of the Wiretap Act's provisions.

The only exemption applicable here to use of a trap and trace device concerns use by an electronic service provider,

and Section 5771(b) sets forth those instances in which a trap and trace can be conducted. Bell argues, however, that the Wiretap Act does not apply to use of a trap and trace device by a provider of electronic or wire communication service where consent of the user of the service is obtained. Followed to its logical conclusion, Bell would contend and have this Court believe that a Caller*ID subscriber is the user of the service and consents to use of a trap and trace device by subscribing to Caller*ID. This argument must fail when one considers that "user" includes "any person or entity" who uses the telephone network and that a contrary and reasonable interpretation of that term could also be construed as the calling party rather than the Caller*ID subscriber. 18 Pa. C.S. § 5702. Hence, Bell's consent analysis fails to support an exception to the Wiretap Act.

■ Neither the Caller*ID device nor the data captured by the device is controlled or maintained by Bell but rather by the customer subscriber, clearly violating the trap and trace device prohibition. In concluding that Caller*ID violates the Wiretap Act, the ALJ correctly determined as follows:

[T]he Legislature has specifically excluded from the term 'pen register' devices used by the telephone company or by the customer to record outgoing numbers for billing or cost accounting purposes in the ordinary course of business. No similar exclusion is appended to the definition of 'trap and trace device.' Had the Legislature intended the term 'trap and trace device' to exclude a device, such as Caller*ID, which is used in conjunction with a service provided by the telephone company as an ordinary tariffed service, it would have added such an exclusion. The absence of such an exclusion to the term 'trap and trace device,' coupled with the existence of a specific exclusion to the term 'pen register,' suggests that the term 'trap and trace device' must be interpreted as including devices operated by the telephone subscriber, such as Caller*ID.

. . . .

By analogy, Bell's argument that a Caller*ID device should not be considered a 'trap and trace device' because it ordinarily is used by a telephone subscriber in connection with a service furnished by the phone company is without merit.

Finally, if a Caller*ID device is attached surreptitiously to the phone line of a Caller*ID subscriber, the person attaching the Caller*ID device can intercept the calling party numbers without the knowledge of the subscriber.... Thus, a Caller*ID device can be used to implement a 'trap and trace' on a Caller*ID subscriber's phone line.

ALJ R. Decision, pp. 38–41. Moreover, the Attorney General of Pennsylvania has agreed in his brief that Caller*ID is a trap and trace device as defined by the Wiretap Act, although contending that it is the service which falls within the definition and not the display unit purchased by the consumer. Brief of Amicus Curiae, Attorney General of Pennsylvania, p. 4.

Petitioners suggest, however, that Caller*ID may satisfy the Wiretap Act if all parties to the interception consent to its use and that blocking would permit callers to consent to transmission of their telephone number. Section 5704 of the Wiretap Act, 18 Pa. C.S. § 5704, provides that it shall not be unlawful for:

(4) [a] person, to intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception.

Thus, where making a call without blocking the calling number transmission, callers would provide implied consent for transmission of their telephone number information. For reasons discussed later in this opinion, Petitioners' suggestion is untenable.

### III

Petitioners next argue that providing Caller*ID without making available a blocking mechanism to the general public violates the privacy protections conferred by the Penn-

sylvania Constitution and that Bell's contention that state constitutional protections do not apply here is without legal foundation.[4] The ALJ, while not finding a violation of Article I, sections 1 and 8 of the Pennsylvania Constitution, advanced the view that Caller*ID neither enhances nor threatens privacy rights "but merely increases the cost of privacy." ALJ R. Decision, p. 73.

Bell argues that no constitutional violations occur through the offering of Caller*ID and moreover that the U.S. Constitution requires state action before a party may invoke constitutional rights, citing *Jackson v. Metropolitan Edison Co.*, 348 F.Supp. 954 (M.D.Pa.1972), *affirmed,* 483 F.2d 754 (3rd Cir.1973), *affirmed,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Here, Bell contends that courts do not recognize a constitutional right to be free from any and all forms of electronic surveillance, wiretapping or eavesdropping and further that single party consensual recordings are constitutional, and as Petitioners fail to establish a property interest in telephone anonymity, their due process arguments must fail. *Commonwealth v. Blystone,* 519 Pa. 450, 549 A.2d 81 (1988), *affirmed,* —— U.S. ——, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). Although not waiving its claim that the constitutional issues were not properly preserved for review, Bell contends that the right to privacy, if one does exist, is the right to be left alone from governmental invasions and that if it is possible for a private citizen to violate another's privacy rights at a constitutional level, it is the right to be left alone that must be preserved and that Caller*ID protects that right.

█ Petitioners persuasively argue that approval of Caller*ID by the Commission constitutes state action which

---

**4.** Bell contends that Petitioners' constitutional challenges have been waived since they failed to file Exceptions to the ALJ decision and to raise this issue before the Commission. The constitutional issues were raised before the ALJ and subsequently in Petitioners' Reply Exceptions to the Commission. Having been the successful parties before the ALJ, Petitioners did not file Exceptions to his decision. The constitutional right to privacy issue has therefore not been waived by Petitioners and will be reviewed by this Court. *See Sherwood v. Elgart,* 383 Pa. 110, 117 A.2d 899 (1955); *Burchanowski Tax Case,* 32 Pa.Commonwealth Ct. 207, 378 A.2d 1025 (1977).

violates federal constitutional privacy protections in that the Commission as a regulatory agency is facilitating Bell's intrusion into the privacy rights of citizens of this Commonwealth, thereby making federal constitutional protections applicable to the Commission action. *Jackson.* *See United States v. Westinghouse Electric Corp.,* 638 F.2d 570 (3rd Cir.1980), for discussion of the balancing test applied in determining whether a particular government action violated constitutionally protected privacy rights.

 One cannot refute the fact that Bell has enjoyed an historical monopoly and virtual domination in the telecommunications area. *U.S. v. American Telephone and Telegraph Co.,* 552 F.Supp. 131 (D.D.C.1982), *affirmed,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Nor can one likewise challenge the fact that Bell may not offer Caller*ID to its subscribers without the imprimatur of the Commission. In *Jackson,* the U.S. Supreme Court stated that:

> [i]t may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be 'state' acts than will the acts of an entity lacking these characteristics. But the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself ... The true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required in order to determine whether the test is met.

*Id.* at 350–51, 95 S.Ct. at 453. Ultimately, in construing what action constitutes state action for purposes of invoking constitutional prohibitions, courts must be guided by the following observations:

> Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.... Owing to the very 'largeness' of government, a multitude of relationships might appear to some to fall within the [Fourteenth]

Amendment's embrace, but that, it must be remembered, can be determined only in the framework of the peculiar facts or circumstances present.

*Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 725–26, 81 S.Ct. 856, 860, 861–62, 6 L.Ed.2d 45 (1961). Courts are further cautioned that in making the particularized inquiry, focus should not be on whether a single fact or relationship demonstrates a sufficient degree of state action but whether considering the aggregate of all pertinent factors, a finding of state responsibility is required. *Jackson; Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). *See also National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), citing *Jackson* and *Burton,* for a general discussion of what constitutes state action.

▮ The conclusion is therefore inescapable that, within the framework of the relevant factual circumstances here, the action taken by the Commission to approve Bell's amended tariff to allow Caller*ID must be construed as state action sufficient to justify the application of constitutional prohibitions, even recognizing the principle that furnishing of utility service is generally not considered to be a state function. *See Bartholomew v. Foster,* 115 Pa.Commonwealth Ct. 430, 541 A.2d 393 (1988), *affirmed,* 522 Pa. 489, 563 A.2d 1390 (1989). Not only did the Commission require extensive investigatory hearings in selected locations throughout the Commonwealth, but its further action in ordering limited blocking to certain designated individuals or groups to prevent harm absent a request by the parties to do so and requiring a certification process to be implemented by federal, state or local law enforcement agencies effectively takes this case out of the realm of mere regulation of private enterprise and transforms the Commission's decision into one of state action. Hence, an analysis of the aggregate of all relevant factors here compels a finding that a sufficiently close nexus exists between the state and the challenged service, thereby creating state responsibility in the approval of Caller*ID. *See generally*

Smith, *We've Got Your Number! (Is It Constitutional to Give It Out?: Call Identification Technology and The Right to Informational Privacy)*, 37 UCLA L.Rev. 145 (1989). Finding the necessary state action component, this Court shall review Petitioners' constitutional challenges.

■ In *Denoncourt v. Commonwealth, State Ethics Commission*, 504 Pa. 191, 470 A.2d 945 (1983), the Supreme Court held that an independent constitutional right of privacy exists in the Pennsylvania Constitution arising under Article I, sections 1 and 8. In the context of unauthorized distribution or seizure of an individual's telephone number, the Superior Court stated in *Beauford:*

> [W]e are convinced that a person picking up a telephone in his home or office fully expects that the number he is about to dial will remain as private as the contents of the communication he is about to have. That number provides a strong, sometimes conclusive inference as to whom is being called, unquestionably a private matter. The caller certainly evidences no intention to shed his veil of privacy merely because he chooses to use the telephone to make private contacts. In modern-day America the telephone call is a nearly indispensable tool used to conduct the widest range of business, government, political, social, and personal affairs.

*Id.*, 327 Pa.Superior Ct. at 265, 475 A.2d at 789. The foregoing leaves little doubt that an individual has a right to privacy in the use of his or her telephone and that unauthorized seizure or disclosure of one's telephone number will not be permitted by the courts of this Commonwealth.[5] *Accord Melilli* where the Supreme Court in reaffirming principles espoused in *Beauford* stated that efforts to make distinctions between telephone numbers and conversational content are constitutionally untenable in that Court's view.

■ The ALJ found that the private Bell customer would have less control over the distribution of his or her

---

5. *See also Commonwealth v. Brachbill,* 520 Pa. 533, 555 A.2d 82 (1989); *Commonwealth v. Kean,* 382 Pa.Superior Ct. 587, 556 A.2d 374 (1989).

telephone number and that many private customers testified that Caller*ID violated their privacy expectations in maintaining private telephone numbers. The ALJ also found that Caller*ID potentially increases telemarketing and other sales calls; threatens an individual's ability to receive or make contact with groups and other organizations; presents a threat to battered women and those attempting to assist battered women; jeopardizes various other social, therapeutic and community groups in their contacts with clients; and threatens law enforcement officials and their informants and tipsters. ALJ R. Decision, pp. 88–96. Considering these findings, which are supported by credible evidence of record, Caller*ID poses a substantial invasion of the personal privacy rights of the citizens of this Commonwealth.

An issue which must therefore be addressed is whether Caller*ID with blocking is constitutionally permissible in view of the privacy intrusions caused by such service. Bell advocates that blockable Caller*ID is unfeasible and that anyone wishing to maintain anonymity and avoid transmission of his or her telephone number may do so by making pay telephone calls at the current twenty-five cents per call; credit card calls at the current forty cents per call; or operator assisted calls currently charged at one dollar twenty cents per call. Such suggestion rises to absurdity when considering the inconveniences and added costs imposed upon consumers to protect their privacy and the nominal advantages to accrue from Caller*ID when balanced against the grave intrusions of privacy threatened against the people of this Commonwealth.[6]

6. Moreover, the ALJ found that other CLASS services provided substantial tracing services which effectively rendered Caller*ID insignificant. Where harassing calls occur, Bell is equipped to trace calls through other services including Call*Return, Call*Block and Call*Trace. ALJ R. Decision, p. 19. The Dissenting Commissioner also determined that other available services provided by Bell are equipped to reduce harassing and obscene telephone calls without any of the statutory or constitutional violations inherent in unblockable Caller*ID and that because of its capabilities, Call*Trace should be the response to obscene and harassing telephone calls. This position is certainly supported by the record, and this Court therefore agrees that

. Notwithstanding the Commission's limited blocking order or whether wholesale blocking was made available by Bell to the general public either free or for charge, the potential for privacy violations still exists for that undefinable segment of the general public who lacks notice of a blocking option; cannot afford the additional expense if blocking were available for a fee; forgets to trigger the blocking mechanism in cases of emergency or trauma; *ad infinitum.*

In reviewing the privacy challenges presented to Caller*ID, this Court is guided by further observations of the Supreme Court in *Murray:*

It is clear . . . that the privacy of the telephoning public is the interest which must first arrest one's attention in dealing with this problem. A mere passing acquaintance with the daily newspaper suffices to substantiate the existence of a widely felt and insidious threat to individual privacy posed, not only by technological advances, but also by the evolution of contemporary social structures. A jealous regard for individual privacy is a judicial tradition of distinguished origin, buttressed in many areas by the imperative mandate of constitutional guarantees. Protection of individual privacy, however, appears frequently to reduce the methods available to law enforcement agencies in the detection and prosecution of crime. Few would deny that in this country today concern with the growth of criminal activity is of the same order of magnitude as the concern with the erosion of individual privacy.

*Id.,* 423 Pa. at 57, 223 A.2d at 112–113. Hence, consumers of telephone service should not suffer an invasion, erosion or deprivation of their privacy rights to protect the unascertainable number of individuals or groups who receive nuisance, obscene or annoying telephone calls which can already be traced or otherwise dealt with by existing services provided by Bell. Guided by the wise observations in

existing Bell services are equipped to perform the function of reducing harassing, annoying and obscene telephone calls.

*Murray,* this Court will unhesitatingly uphold the judicial tradition of "jealous regard for individual privacy." In so doing, this Court concludes that Caller*ID, either in its blockable or unblockable format, violates the privacy rights of the people of this Commonwealth. In the framework of a democratic society, the privacy rights concept is much too fundamental to be compromised or abridged by permitting Caller*ID.

## IV

Next, Petitioners argue that the Commission's order regarding the availability of a blocking mechanism on a limited basis violates due process. After recognizing that certain individuals may require blocking to maintain their personal safety, the Commission created a certification process to identify those individuals entitled to blocking which lacks procedural standards or any provisions for notice, hearing or appeal. In his opinion and order granting a partial stay of the Commission's order, President Judge Crumlish stated that the record is devoid of evidence establishing even the most minimal guidelines for this certification process. As such, Petitioners aptly argue that the certification process which fails to provide for notice to the general public constitutes arbitrary government action and creates a procedure lacking in due process protections guaranteed by the Fourth Amendment of the U.S. Constitution, through the Fourteenth Amendment, and Article I, section 1 of the Pennsylvania Constitution.

Fundamental questions remain unresolved by the Commission's order. Questions appropriately posed by Dissenting Commissioner Rhodes include whether the certification process will create an unwanted burden upon law enforcement agencies; who will designate the duly authorized law enforcement official; whether the certification decisions are appealable, and if so, what appeal procedures are applicable; who will pay the cost for the certification process; who will perform certification in the event a particular law enforcement agency refuses to perform the certification;

and finally, who bears the risks in the event an individual denied blocking certification is subsequently injured as a result of Caller*ID. Hence, the Commission's order in this regard is fatally flawed and thus unlawful as it lacks minimal due process standards. *See Barasch v. Pennsylvania Public Utility Commission,* 119 Pa.Commonwealth Ct. 81, 546 A.2d 1296, *following reargument,* 119 Pa.Commonwealth Ct. 81, 550 A.2d 257 (1988), *appeal denied,* 523 Pa. 652, 567 A.2d 655 (1989).

## V

The blocking remedy was not proposed by any of the parties to the proceedings nor by the ALJ and is, according to Petitioners, unsupported by substantial evidence of record. The Commission adopted the ALJ findings and did not require additional evidence but concluded that the limited blocking to be offered to select individuals and groups would protect callers from any harm which might occur as a result of Caller*ID. Further, the Commission order neither refers to specific evidence to support its decision to allow blocking to selected individuals and groups nor adequately explains the basis for its rejection of the ALJ's analysis.

Bell initially contends that all of the benefits it predicts from Caller*ID have been borne out in New Jersey relying upon testimony by various individuals that anonymous telephone calls, false alarms, and other annoying telephone calls have been reduced.[7] Evidence was presented by Bell to demonstrate the benefits of Caller*ID which presumably supports the conclusion that Caller*ID would discourage or deter criminal and annoying behavior. Bell's witnesses purported to show that a majority of Pennsylvania residents will benefit from Caller*ID and that it will reduce substantially the number of obscene and annoying telephone calls made to residents within this Commonwealth.

7. The New Jersey experience, however, is less than reliable as Caller*ID has only been available on a permanent basis in New Jersey since October 20, 1988.

It is conceivable that Caller*ID is just as likely to encourage criminal or annoying behavior as it would to discourage such conduct particularly in those instances where a prank or obscene caller subscribes to Caller*ID and consequently has the capacity to develop a list of telephone numbers in his or her data base for use in making such calls. (Caller*ID has the capacity to display sixty-four ten digit telephone numbers including area code along with the date and time of each call.) Moreover, it is highly unlikely that criminals plotting serious crime would do so from his or her own home telephone as a substantial amount of criminal contact occurs through the public telephone. To buttress its arguments, Bell cites testimony regarding assaults and murders of pizza delivery persons; bomb threats to hospitals; drunken or drugged persons who assault hospital staff; evidence of a baby's life being saved in New Jersey because of Caller*ID; and false fire and other emergency reports which utilize the resources of emergency personnel and reduce their ability to respond to real emergencies. Yet, none of the parties recognize that if blocking were made available to the general public as advocated, the reasonable and anticipated result is that those who are inclined to make anonymous calls will secure the blocking feature to avoid transmission of the caller's telephone number, effectively emasculating the purposes of and intent behind Caller*ID.

Bell contends that its existing services, i.e., Call*Trace and Call*Block are insufficient to provide the type of service which Caller*ID is designed to offer subscribers, in that the other services do not provide the immediate display of a telephone number in the event of an abusive call. Further, Bell argues that the only deterrent to abuse calling is Caller*ID; and any individual who wishes to retain anonymity may simply make operator assisted calls, credit card calls or coin operated telephone calls—methods of calling which can also justifiably apply to those obscene and annoying crank callers or other criminals whose contact Caller*ID is designed to minimize or deter. Petitioners' arguments

here must be sustained as well. The Commission took no additional evidence on the issue of restricted blocking and *sua sponte* imposed limited blocking for those designated individuals and groups without the benefit of testimony or other evidence which may have demonstrated a different result.

\* \* \*

Viewing the record in the context of this Court's limited scope of review, the conclusion mandated here is that the Commission erred in rejecting the ALJ's determination that Caller\*ID violates the Wiretap Act and further that the Commission's order approving Caller\*ID violates constitutional privacy and due process rights and is not supported by substantial evidence of record.[8]

## ORDER

AND NOW, this 30th day of May, 1990, the order of the Pennsylvania Public Utility Commission is reversed.

The decision in this case was reached prior to the retirement of former President Judge CRUMLISH, Jr.

PALLADINO, J., did not participate in the decision in this case.

PELLEGRINI, Judge, concurring and dissenting.

Caller\*ID is a new type of phone service that has never been previously available to Pennsylvania phone subscribers. For the first time, Bell of Pennsylvania (Bell) proposes to universally offer a service that provides more to its subscribers than dial tone service for the transmission of voice and data; a service that provides information and not merely transmits it. Caller\*ID is everyone's introduction,

---

**8.** Petitioners also argue that the Commission's order is discriminatory in that it establishes three classes of Bell customers and that such classification violates the anti-discrimination provisions of the Public Utility Code, 66 Pa. C.S. § 1505, as well as constitutional guarantees of equal protection. While Petitioners' arguments may have merit, there is no need to address this issue because of the rulings made by this Court today.

for better or worse, to interactive entrepreneurial telecommunications.

To determine whether Caller*ID is a service that will be better or worse for phone subscribers, the Pennsylvania Public Utility Commission (PUC) attempted to balance the competing interests of Bell's subscribers. Some subscribers say Caller*ID is needed to stop harassing and threatening phone calls; others say it will present a threat to battered and threatened spouses and children whose location will become known through Caller*ID. Even others say it will advance commercial interests allowing them to be of better service to their customers; and others counter this too by saying it will constitute an invasion of privacy.

No matter the propriety of the outcome of the PUC's application of this balancing test, the result must still be in accord with the laws and Constitution of Pennsylvania, which embody fundamental policy and social interests. I concur with the well-reasoned majority opinion that Caller*ID violates the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. §§ 5701–5781 (Wiretap Act) and that Call Blocking does not offer a method of curing that violation. However, I dissent to the majority's making a finding that Caller*ID violates Article I, Sections 1 and 8 of the Pennsylvania Constitution as constituting an invasion of privacy.

## I.

I agree with the majority that Caller*ID violates the Wiretap Act. The majority holds that Caller*ID intercepts an electronic communication through the means of a "trap and trace" device [1] which is prohibited by the Wiretap Act. I agree with the majority holding for the reasons they set forth as well as an additional one.

---

**1.** 18 Pa. C.S. § 5702 defines "trap and trace device" as a device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which the wire of electronic communication was transmitted. *See also* 18 U.S.C. § 3127.

Bell's main contention is that the Wiretap Act's prohibition against trap and trace devices does not address phone calls between parties to the communication but only third-party interception of those communications.[2] They contend that if any "user" of the communication agrees to have the phone number "trapped and traced," it is permitted. To examine this argument, it is necessary to examine the Wiretap Act and its history, especially the 1988 amendments, to see if Caller*ID is prohibited by the Wiretap Act.

The "trap and trace" provisions of the Wiretap Act were added in 1988 as a result of a mandate contained in the federal Electronic Communications Privacy Act of 1986, Act of October 21, 1986, P.L. 99–508, which required the states to be in compliance with its provisions within two years of its enactment. See 18 U.S.C. § 2510. *See also* 1988 Pennsylvania Legislative Journal—House 1685. Complying with this mandate, the General Assembly passed the 1988 amendments (Act of October 21, 1988, P.L. 1000) which, in all relevant aspects, were identical to the federal legislation.

2. Bell also contends that the provisions of the Wiretap Act are inapplicable because Caller*ID is not a "trap and trace" device as defined by that Act. In effect, contending that it is irrelevant that Caller*ID identifies the originating number, Bell argues that the Caller*ID display unit is a device incapable of trapping and tracing a phone number. It is nothing but a dumb terminal that receives and displays numbers captured, stored and transmitted by Bell equipment which are generated in the ordinary course of call routing and switching and those signals which are a part of every call. Consequently, Bell argues that Caller*ID is not a "trap and trace" device.

Nothing in this legislation indicates that the General Assembly intended such an interpretation of the Wiretap Act. It is inconceivable that the General Assembly would prohibit devices that, while incapable on their own to "trap and trace", would be able to provide the same result that it was attempting to regulate. To adopt Bell's suggested interpretation would be as if to say burglary is outlawed but receiving stolen property is permitted. It would place telephone customers in the position of violating the Wiretap Act by virtue of their non-consensual receipt of the calling party's telephone number, making them unwitting accomplices in conduct which subverts the law literally at their own expense. The General Assembly, by "trap and trace" device, meant the means used to accomplish the identification of the originating phone number, even though it involved Bell switching equipment, wires or fiber optic cable to transmit the signal, or a Caller*ID display unit, or, for that matter, any method by which that result occurs.

Both reports issued by the Judiciary Committees of the United States House (H.R. 99–647) and Senate (S. 99–941) indicated that the purpose behind the passage of the federal law was to increase privacy protections afforded to citizens. As the Senate Report states (p. 5):

[t]he law must advance with the technology to ensure the continued vitality of the fourth amendment. Privacy cannot be left to depend solely on physical protection, or it will gradually erode as technology advances. Congress must act to protect the privacy of our citizens. If we do not, we will promote the gradual erosion of this precious right.

In this area of "pen registers"[3] and "trap and trace" devices, the legislative history is particularly illuminating. Because the Supreme Court of the United States has held that "pen registers," *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), and "trap and trace" devices, *Rathbun v. United States,* 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), do not violate the Fourth Amendment and could be installed by a law enforcement agency without a warrant, the Electronic Communications Privacy Act was passed to extend *federal* statutory protection to unwarranted intrusion through the use of these devices.

The Senate Judiciary Committee stated that the Electronic Communications Privacy Act of 1986, contains "a general prohibition against the installation or use of a pen register or trap and trace device without a court order," Senate Report 99–541 at p. 46, unless covered by one of the three exceptions. The exception that Bell contends that would allow the use of Caller*ID is "with the consent of the user." In the context of federal law, Congress did not intend to prohibit "trap and trace" devices, including Caller*ID, as long as the called party consents which he or she obviously

---

**3.** 18 Pa. C.S. § 5702 defines "pen register" as a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted, with respect to wire communications on the telephone line to which the device is attached. *See also* 18 U.S.C. § 3127.

does when the service is purchased.[4] This conclusion is in accord with the general federal law and that of most states that only one party need consent to have a phone conversation recorded or monitored by one of the parties or to allow a third-party, including governmental agencies, to record or monitor that conversation.

Even though Pennsylvania has a nearly identical "trap and trace" provision, the 1988 Pennsylvania amendments, adopted in compliance with federal law, must be interpreted together with the underlying Pennsylvania Wiretap Act. In Pennsylvania, our Wiretap Act is much more protective of individual rights than the corresponding federal legislation. Except in limited instances in Pennsylvania, all party consent is necessary prior to interception and disclosure of any communication. Section 5703 of the Wiretap Act, 18 Pa. C.S. § 5703, expressly prohibits the interception of any wire or oral communication:

> Except as otherwise provided in this chapter, a person is guilty of a felony of the third degree if he:
>
> (1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication;
>
> (2) intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral

4. 18 U.S.C. § 3121(b) provides that the prohibition with respect to "pen registers" and "trap and trace" devices does not apply:

(1) relating to the operation, maintenance, and testing of a wire or electronic communication service or to the protection of the rights or property of such provider, or to the protection of users of that service from abuse of service or unlawful use of service;

(2) to record the fact that a wire or electronic communication was initiated or completed in order to protect such provider, another provider furnishing service toward the completion of the wire communication, or a user of that service, from fraudulent, unlawful or abusive use of service; or

(3) where the consent of the user of that service has been obtained.

The Pennsylvania exceptions are identical except that the wording of the third and operative exclusion is not a separate subsection and is stated as "or with the consent of the user." 18 Pa. C.S. § 5771. I ascribe no difference in intent or meaning between the state and federal legislation as a result of the difference in language but attribute it merely to "scrivner's choice."

communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or

(3) intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication.

It is only Section 5704(4) that allows monitoring and recording when both parties consent:

(4) A person, to intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception.

Pennsylvania courts have also consistently held that the interception of or recording of a telephone conversation by a private party without the consent of all of the parties violates the Wiretap Act. *See, e.g., Commonwealth v. Jung,* 366 Pa.Superior Ct. 438, 531 A.2d 498 (1987); *Zinman v. Unemployment Compensation Board of Review,* 8 Pa.Commonwealth Ct. 649, 305 A.2d 380 (1973). Consequently, when the 1988 amendments were adopted by the General Assembly, they were grafted onto a legislative scheme very different and one that is much more protective of individual rights than federal law. Even though the language of the federal law and 1988 amendments to the Wiretap Act are nearly the same, by not changing the "all party consent rule," it is clear that the General Assembly meant that any part of the communication, including phone number identification, should have the consent of all parties prior to it being trapped and traced. Consequently, as used in 18 Pa. C.S. § 5771(b), the term user is all parties to the call, and, consequently, if all parties to the call do not consent, the Wiretap Act is violated.

Bell contends that as a result of this holding, it would preclude police departments from receiving phone numbers of individuals placing phone calls who may be in distress. Contrary to this assertion, "enhanced 911" already offers to

those systems on which it has been installed both the phone number and geographic location, *i.e.*, address where the phone call is entering the system. Smith, *We've Got Your Number! (Is It Constitutional to Give It Out?: Call Identification Technology and The Right to Informational Privacy)*, 37 UCLA L.Rev. 145, 209 (1989). More importantly, this type of "trapping and tracing" is specifically permitted as an exclusion from the "all party consent rule" contained in the Wiretap Act. Section 5704(3) provides that it shall not be unlawful for:

> (3) Police and emergency communications systems to record telephone communications coming into and going out of the communications system of the Pennsylvania Emergency Management Agency or a police department, fire department or county emergency center, if:
>
>> (i) the telephones thereof are limited to the exclusive use of the communication system for administrative purposes and provided the communication system employs a periodic warning which indicates to the parties to the conversation that the call is being recorded;
>>
>> (ii) all recordings made pursuant to this clause, all notes made therefrom, and all transcriptions thereof may be destroyed at any time, unless required with regard to a pending matter; and
>>
>> (iii) at least one nonrecorded telephone line is made available for public use at the Pennsylvania Emergency Management Agency and at each police department, fire department or county emergency center.

Caller*ID and "enhanced 911," in compliance with the provisions of this subsection, are permissible when used by public safety agencies. *See also Commonwealth v. Gullett*, 459 Pa. 431, 329 A.2d 513 (1974); *Commonwealth v. Topa*, 269 Pa.Superior Ct. 473, 410 A.2d 354 (1978).

## II.

The Pennsylvania Attorney General's Office of Consumer Advocate (Consumer Advocate) suggests that Call Blocking,

if offered free of charge to all telephone subscribers, represents an adequate safeguard against impermissible disclosure of an originating caller's telephone number. For Call Blocking to satisfy the "all party consent" requirement, 18 Pa. C.S. § 5704(4), it would be implied that those who failed to call block gave their consent to have their call "trapped and traced." The Wiretap Act, however, gives no support to the idea that the privacy rights that the General Assembly was attempting to protect can be secured by shifting the burden to individuals to protect their right of privacy. By providing that "prior consent must be given" and by listing exceptions to "all party consent," the General Assembly has specifically indicated its intent that the consent to interception of a transmission cannot be implied.

## III.

While I agree that Caller*ID violates the Pennsylvania Wiretap Act, I dissent to our reaching the issue of whether Caller*ID constitutes such an invasion of privacy in violation of Article I, sections 1 and 8 of the Pennsylvania Constitution.[5]

5. I do not believe that a "state action" analysis is appropriate when determining the application of state constitutional protection. "State action" is a pre-requisite to the exercise of federal jurisdiction under the Fourteenth Amendment and Section 1983 of the Civil Rights Act to stop wrongdoers who are acting under state authority. *National Collegiate Athletic Association v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454 at 461, 102 L.Ed.2d 469 (1988). Our Supreme Court adopted a similar view in *Bartholomew v. Foster,* 522 Pa. 489, 563 A.2d 1390 (1989) (equally divided court), citing from *Hartford Accident & Indemnity v. Insurance Commission,* 505 Pa. 571, 482 A.2d 542, that the "state action" doctrine is a jurisdictional prerequisite prior to federal courts invoking federal protections and is irrelevant to the application of state constitutional rights. Because our Supreme Court has only applied invasion of privacy protection under our Constitution in instances where there has only been direct government involvement, (*See, e.g., Commonwealth v. Melilli,* 521 Pa. 405, 555 A.2d 1254 (1989); *Denoncourt v. State Ethics Commission,* 504 Pa. 191, 470 A.2d 945 (1983)), it is an open question whether that protection is applicable to regulations or adjudications made by state agencies.

Even if "state action" is necessary to invoke the privacy protection under Article I, Sections 1 and 8, I do not believe that the PUC, in approving Caller*ID, was engaged in state action. State action involves something more than adjudicating a Bell tariff charge, which it

Our Supreme Court has mandated that when cases comprising both constitutional and non-constitutional issues arise, the courts of this Commonwealth should not decide constitutional issues in cases which can properly be decided on non-constitutional grounds. *See Ballou v. State Ethics Commission*, 496 Pa. 127, 436 A.2d 186 (1981). Likewise, this Court has exercised restraint and adherence to this admonition. *Friedlander v. Zoning Hearing Board of Sayre Borough*, 119 Pa.Commonwealth Ct. 164, 546 A.2d 755 (1988); *Atlantic–Inland v. Board of Supervisors of Goshen Township*, 48 Pa.Commonwealth Ct. 397, 410 A.2d 380 (1980).

Judicial restraint is particularly appropriate to follow in this matter. Through the Wiretap Act, the General Assembly has enacted a comprehensive legislative scheme over the entire area of interception of both conversations and electronic communications. The legislature has been sensitive to the needs of the telecommunications industry as well as being vigilant in protecting privacy rights of Pennsylvanians. In a fast moving technological era, innovation may have benefits to society that in some instances might outweigh an individual's right to privacy (*e.g.*, "enhanced 911").[6]

In light of the constant technological advances and the shifting balance that invariably results, we should not prematurely enunciate a constitutional prohibition until the

did not encourage or require to bring before it. The PUC is not interested in whether Bell offers this service or not; it did not become involved in or give its imprimatur to Caller*ID. It only carried out its statutory duty to adjudicate requests that come before it. Section 1983 liability should not attach merely because you adjudicate requests. *See Jackson v. Metropolitan Edison Co.,* 348 F.Supp. 954 (M.D.Pa.1972), *aff'd,* 483 F.2d 754 (3rd Cir.1973), *aff'd* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). *See also National Collegiate Athletic Association.*

6. Another example of the General Assembly reestablishing the balance between technological developments and privacy rights is contained in Section § 5704(9) of the Wiretap Act, 18 Pa. C.S. § 5704(9), which allows only one party consent to the recording and disclosure involved in computer communications, electronic mail and voice mail. The legislature realizes that such an important method of communication would otherwise be both unavailable and illegal.

General Assembly, as it did here, has an opportunity to re-establish the balance. Ultimately, the outcome of the balancing test on privacy issues will be determined by experience and the consensus that results from that experience. Until absolutely forced, we should exercise judicial restraint and avoid deciding this case on constitutional grounds.

Having found that Caller*ID is violative of the Wiretap Act and that the PUC's order in this matter constitutes an error of law requiring its reversal, we have effectively resolved the controversy between these litigants without addressing the constitutional question respecting privacy infringement. Therefore, I must dissent to the majority's extending this Court's disposition of this matter to the resolution of a constitutional question.

Accordingly, I concur in Parts I and II and in the result to Parts IV and V, and dissent as to Part III of the majority's opinion.

McGINLEY, J., joins in this concurring and dissenting opinion.