**Allen Craig WELLS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 90–250.

Supreme Court of Wyoming.

Dec. 31, 1992.

Concurring in Part and Dissenting in Part Opinion By Justice Urbigkit Feb. 1, 1993.

Leonard D. Munker, State Public Defender, Gerald M. Gallivan, Defender Aid Program, and Deborah A. Gabriel, Student Director, and Elizabeth A. Rinaldo, Student Intern, for the Defender Aid Program, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., Jennifer L. Gimbel, Sr. Asst. Atty. Gen., and Theodore E. Lauer, Director, and Teresa M. Riley, Student Intern, for the Prosecution Assistance Program, for appellee.

Before MACY, C.J., CARDINE and URBIGKIT,* JJ., and TAYLOR and SPANGLER, District Judges.

MACY, Chief Justice.

Appellant Allen Craig Wells appeals from his convictions for conspiracy to distribute a controlled substance and for distribution of a controlled substance.

We affirm.

Appellant raises the following issues:

I. Whether evidence concerning telephone records and evidence derived therefrom was improperly admitted.

II. Whether the court below erred in failing to suppress inculpatory statements made by Appellant in response to questions posed by investigating officers during extradition transportation.

III. Whether testimony of witnesses about pleading guilty and/or being convicted on charges similar to or identical to those for which the Appellant was on trial and which arose out of the same criminal transaction was improperly admitted.

IV. Whether hearsay testimony by investigative agents used to buttress the credibility of a convicted felon was improperly admitted.

As a result of an investigation by the Division of Criminal Investigation (DCI), Kevin Steiner was arrested on September 12, 1989, for distributing cocaine. DCI agents subsequently conducted a search of Steiner's residence and found, among other things, cocaine, illegal drug paraphernalia, $1,110 in cash, and a telephone bill. During an interrogation, Steiner said he bought the cocaine from Appellant, and he identified two Colorado telephone numbers on the telephone bill as being numbers which he used to contact Appellant. A DCI agent called the Drug Enforcement Agency (DEA) in Denver, Colorado, to obtain subscriber information on the two telephone numbers. One of the numbers was published, and one was not published. Using an administrative subpoena, a DEA agent determined the origin of the numbers. Agents used that information to locate and arrest Appellant.

Appellant was extradited from Colorado, and on August 15, 1990, a jury found him guilty of conspiracy to distribute a controlled substance in violation of Wyo. Stat. §§ 35–7–1042, 35–7–1031(a)(i), and 35–7–1016(b)(iv) (1988)[1] and of distributing a

---

* Chief Justice at time of oral argument; retired 1/1/93.

1. Section 35–7–1042 provides:

   Any person who attempts or conspires to commit any offense under this article within the state of Wyoming or who conspires to commit an act beyond the state of Wyoming which if done in this state would be an offense punishable under this article, shall be punished by imprisonment or fine or both

controlled substance in violation of §§ 35–7–1031(a)(i) and 35–7–1016(b)(iv). The district court sentenced Appellant to confinement in the Wyoming State Penitentiary for a term of not less than five years nor more than seven years for each conviction. The court ordered the sentences to run consecutively. This appeal followed.

## Admissibility of Telephone Records

Appellant contends that the district court erred by receiving telephone subscriber information into evidence. Pursuant to a request by the DCI and an administrative subpoena, a DEA agent obtained records from a telephone company and located two telephone numbers which received calls from Steiner's telephone. That information was used to find Appellant. Appellant argues that the information was inadmissible because its acquisition was prohibited by Wyo. Stat. §§ 7–3–601 to –611 (1987 & Supp.1992). Section 7–3–606(p) states:

(p) The contents of any intercepted wire, oral or electronic communication or evidence derived therefrom shall not be admitted as evidence in any trial, hearing or other proceeding in this state unless the interception was performed in accordance with this act.

Section 7–3–602 provides in pertinent part:

(a) Except as provided in subsection (b) of this section, no person shall willfully:

(i) Intercept any wire, oral or electronic communication;

. . . .

which may not exceed the maximum punishment prescribed for the offense the commission of which was the object of the attempt or conspiracy.
Section 35–7–1031(a)(i) provides:
(a) Except as authorized by this act, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance. Any person who violates this subsection with respect to:
(i) A controlled substance classified in Schedule I or II which is a narcotic drug, is guilty of a crime and upon conviction may be imprisoned for not more than twenty (20) years, or fined not more than twenty-five thousand dollars ($25,000.00), or both[.]
Section 35–7–1016(b)(iv) states:

(b) Nothing in subsection (a) of this section prohibits:

. . . .

(ii) An officer, employee or agent of any provider of wire or electronic communications service from providing information, facilities or technical assistance to a peace officer who is authorized pursuant to this act to intercept a wire, oral or electronic communication;

. . . .

(v) A peace officer from intercepting, using or disclosing to another peace officer in the course of his official duties any wire, oral or electronic communication pursuant to an order permitting the interception under this act[.]

Section 7–3–601 states in pertinent part:
(a) As used in this act:

. . . .

(ii) "Contents of an oral, wire or electronic communication" includes information concerning the identity of the parties participating in the communication and the existence, meaning, substance or purport of the communication;

(iii) "Electronic communication" means any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce but does not include:

(A) The radio portion of a cordless telephone communication that is trans-

(b) *Substances, vegetable origin or chemical synthesis.*—Unless specifically excepted or unless listed in another schedule, any of the following substances whether produced directly or indirectly by extraction from substances of vegetable origin, independently by means of chemical synthesis or by combination of extraction and chemical synthesis:
. . . .
(iv) Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine[.]

mitted between the cordless telephone handset and the base unit;

    (B) Any wire or oral communication;

    (C) Any communication made through a tone-only paging device; or

    (D) Any communication made through a tracking device.

    ....

    (x) "Wire communication" means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable or other like connection, including the use of such connection in a switching station, between the point of origin and the point of reception, furnished or operated by any person engaged in providing or operating such facilities for the transmission of intrastate, interstate or foreign communications, and includes any electronic storage of such communication, but the term does not include the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit[.]

■ Appellant asserts that the DEA "intercepted" a "wire communication" because it acquired electronically stored information to discover the identity of parties who participated in a communication. We disagree. "Intercept" is defined as "the aural or other acquisition of the contents of any oral, wire or electronic communication by use of an electronic, mechanical or other device." Section 7–3–601(a)(v).

    (iv) "Electronic, mechanical or other device" means any device or apparatus which can be used to intercept a wire, oral or electronic communication, other than:

      (A) Any telephone, telex or telegraph equipment, or component thereof, used in the ordinary course of business....

Section 7–3–601(a)(iv). The agents acquired the information from records kept by the telephone company in its ordinary course of business. Nothing in the record indicates that equipment was installed to intercept any wire, oral, or electronic communication in violation of § 7–3–602(a)(i).

### The Admissibility of Appellant's Statements

Appellant contends that the trial court erred by failing to suppress statements he made to agents who were transporting him from Colorado to Cheyenne, Wyoming. After Appellant was arrested, he signed an affidavit in an effort to have a public defender appointed as his attorney. Via an order dated February 20, 1990, the Laramie County court appointed the public defender's office to represent Appellant. On March 27, 1990, two agents went to Colorado to transport Appellant to Cheyenne. Upon arriving, they informed Appellant of his *Miranda* rights and told him that he was being charged for delivering cocaine and for conspiring with Steiner to deliver cocaine. The three of them began to drive back to Cheyenne. During the suppression hearing, one of the agents described a conversation which occurred as they drove:

    A. Well, Mr. Wells just started the first conversation that had anything to do with the case by saying that he did know Kevin Steiner, and he had been to his house visiting but, you know, we had—that it was completely innocent....

    ....

    Q. What's the next piece of conversation that comes up that's related to this case in any way?

    A. Well, Mr. Wells just said, as far as cocaine goes I've never even seen cocaine, he said he had never seen cocaine, never used it. I said, did you see Kevin Steiner use cocaine, did you ever see cocaine in Kevin Steiner's house....

The agent continued to ask questions, and, in response, Appellant made incriminating statements. Appellant argues that the admission of those statements into evidence violated his rights under the Fifth and Sixth Amendments to the United States Constitution.

■ In *Ramos v. State*, 806 P.2d 822 (Wyo.1991), we discussed one aspect of an accused's right against self-incrimination. We stated:

    Under the fifth amendment to the United States Constitution and article 1,

section 11 of the Wyoming Constitution, an individual cannot be compelled to testify against himself in any criminal case. An accused taken into custody must be informed of this right and of his right to have counsel. Once the individual requests to be represented by counsel, the police must cease any interrogation until the accused is represented by counsel or until he waives his constitutional rights. Interrogation is defined as a "measure of compulsion above and beyond that inherent in custody itself." *Griffin v. State,* 749 P.2d 246, 253 (Wyo.1988). In *[Rhode Island v.] Innis,* [446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980),] the United States Supreme Court stated that interrogation included "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis,* 446 U.S. at 302 [100 S.Ct. at 1690] (emphasis in original) (referred to as the "functional equivalent" of interrogation). "A statement that is not the product of interrogation or compulsion attributable to authorities or some other improper action, is voluntary and admissible." *Griffin,* 749 P.2d at 254.

806 P.2d at 828 (some citations omitted). In the seminal case of *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981), the United States Supreme Court stated:

[A]n accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*

(Emphasis added.) If an accused has requested to be represented by counsel, his right against self-incrimination attaches regardless of whether the interrogating officer knows of the request. *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); *Roper v. State,* 258 Ga. 847, 375 S.E.2d 600, *cert. denied,* 493 U.S. 923, 110 S.Ct. 290, 107 L.Ed.2d 270 (1989). As the Supreme Court stated: "*Edwards*

focuses on the state of mind of the suspect and not of the police." *Roberson,* 486 U.S. at 687, 108 S.Ct. at 2101.

■ The State and Appellant do not dispute that Appellant was in custody when he made incriminating statements. At that time, Appellant had been in a Colorado jail for more than three months and was being extradited to Wyoming by two DCI agents. In addition, we have no trouble concluding that Appellant was subjected to an interrogation as he and the agents traveled to Cheyenne. The quoted excerpt from the suppression hearing demonstrates that one of the agents asked Appellant direct questions about his alleged involvement in the crime. Such questioning is a "measure of compulsion above and beyond that inherent in custody itself," *Griffin v. State,* 749 P.2d 246, 253 (Wyo.1988), and it is within the scope of the rule enunciated in *Edwards* and *Ramos.*

■ To continue with the analysis of Appellant's contention, we must determine whether Appellant requested to be represented by counsel. The State contends that nothing exists in the record to demonstrate that Appellant requested to have counsel. Our reading of the record indicates, however, that Appellant completed and signed an "Affidavit for a Court–Appointed Attorney" and that the Laramie County court appointed the public defender's office to represent Appellant. Both events occurred before Appellant was extradited to Wyoming. Thus, Appellant made a sufficient request to be represented by counsel before he was transported to Cheyenne. *See Roper,* 375 S.E.2d 600. Once that request occurred, the police were barred from interrogating Appellant until his counsel was present or until he waived his constitutional rights. *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Best v. State,* 736 P.2d 739 (Wyo.1987).

■ The State argues that Appellant waived his constitutional right against self-incrimination when he initiated the conversation which led to his incriminating statements. The question of whether a conver-

sation initiated by the accused constitutes a valid waiver of his right against self-incrimination was addressed by the United States Supreme Court in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In that case, the majority held that *Edwards* required the following two-part inquiry to determine whether an accused's right against self-incrimination had been violated: After the accused expressed a desire to be represented by counsel, did he (1) initiate a communication, exchange, or conversation with the police and (2) under the totality of the circumstances, waive his right against self-incrimination? 462 U.S. at 1045–46, 103 S.Ct. at 2834–35.

In *Bradshaw*, the Supreme Court was faced with determining whether a defendant's statement, " 'Well, what is going to happen to me now,' " was sufficient to "initiate" further discussion of his crime under *Edwards*. 462 U.S. at 1042, 103 S.Ct. at 2833. A plurality determined that the statement was sufficient. The plurality applied the word "initiate" in its ordinary dictionary sense and concluded that the statement could reasonably be interpreted by a law enforcement officer to evince a willingness to open up a more generalized discussion relating to the investigation. The plurality noted, however, that bare statements or inquiries concerning routine incidents of the custodial relationship should not ordinarily be found to satisfy the initiation requirement. The plurality, having found no *Edwards* violation, went on to conclude that the defendant knowingly and intelligently waived his constitutional rights under the particular facts of that case.

Under Article 1, Section 11 of the Wyoming Constitution, we adopt the two-part test articulated in *Bradshaw*. *See Best*, 736 P.2d 739. Applying the word "initiate" as it is commonly understood, we hold that the DCI agents could reasonably interpret Appellant's statement, " 'he did know Kevin Steiner, and he had been to his house visiting but, you know, we had—that it was completely innocent,' " as being an expression of willingness to engage in a generalized discussion regarding the investigation.

Appellant made his statement shortly after he was given his *Miranda* rights, and his statement was the first comment made regarding the case. The statement directly embraced topics central to the crimes charged. No violation of the *Edwards* prohibition against police-initiated interrogation existed in this case.

We must now determine if Appellant validly waived his right against self-incrimination. As this Court has previously discussed, a waiver must be knowing and intelligent in light of the particular facts of the case. When the accused is in custody, there is a presumption that incriminating statements are not made voluntarily. The burden is on the State to show otherwise. *Garcia v. State*, 777 P.2d 603 (Wyo.1989); *Dryden v. State*, 535 P.2d 483 (Wyo.1975); *Maki v. State*, 18 Wyo. 481, 112 P. 334 (1911). *See also Frias v. State*, 722 P.2d 135 (Wyo.1986).

An examination of the facts in this case discloses that Appellant knowingly and intelligently waived his right against self-incrimination. Immediately prior to being transported to Wyoming, Appellant was advised of his *Miranda* rights, and he stated that he understood them. Shortly thereafter, Appellant voluntarily initiated a conversation pertaining to his case. No impropriety on the part of the DCI agents is reflected in the record.

Sufficient evidence existed for the trial court to find that both prongs of the *Edwards/Bradshaw* test were satisfied in this case. The trial court did not err in admitting the disputed evidence.

### Admissibility of Prior Convictions

■ Appellant contends that the district court erred by allowing two witnesses to testify about their prior convictions which arose out of the circumstances leading to Appellant's convictions. In *Grable v. State*, 601 P.2d 1001, 1003 (Wyo.1979) (citing *Kwallek v. State*, 596 P.2d 1372 (Wyo. 1979)), this Court held:

> [W]hen two persons are indicted for separate offenses growing out of the same circumstance, the fact that one has plead-

ed guilty is inadmissible against the other when offered by the State in its case-in-chief.

The rationale is that evidence of a witness' guilt for an offense which arose out of a circumstance leading to the defendant's trial implies that the defendant is also guilty. Such an implication violates a defendant's right to have a trial on its own merits. *Kwallek*, 596 P.2d 1372.

We hold that this case does not involve a violation of the rule announced in *Kwallek*. An examination of the testimony by the two witnesses reveals they did not state that their convictions stemmed from the same set of circumstances for which Appellant was on trial. The fact that the jury may have inferred that the two witnesses were convicted for their involvement in Appellant's criminal activity is not prohibited by *Kwallek*.

### Corroborative Testimony

■ Appellant argues that the district court erred by allowing a DCI agent to testify about statements made to him by a witness who previously testified for the State. He also asserts that the district court improperly permitted the agent to say why he believed the witness' version of the facts. Steiner was the first witness to testify for the State. The State subsequently called a DCI agent who testified about statements which Steiner made during his investigation. Appellant's counsel objected to the testimony as being inadmissible hearsay.

W.R.E. 801(d)(1)(B) provides:

A statement is not hearsay if:

(1) Prior Statement by Witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive....

W.R.E. 801(d)(1)(B) contains two conditions: First, the prior statement must be consistent with the declarant's testimony. Second, there must be an express or implied charge of recent fabrication or of improper influence or motive.

*Lacey v. State*, 803 P.2d 1364, 1368 (Wyo. 1990). The testimony given by the DCI agent satisfies both conditions. The parties do not dispute that the DCI agent's testimony was consistent with Steiner's testimony. The record also reveals evidence of an implied charge of improper motive or of recent fabrication. On cross-examination, Appellant's counsel asked questions which suggested that Steiner: (1) told police inconsistent stories; (2) sought to cut a deal with the authorities upon his arrest; (3) spent a lot of time before the trial talking with the prosecutor and investigators; and (4) received a light sentence for his guilty pleas. Under those circumstances, the district court did not err by allowing the DCI agent to testify about Steiner's prior consistent statements.

Finally, Appellant contends that the following exchange between the State and a DCI agent constituted error per se under the authority of *Bennett v. State*, 794 P.2d 879 (Wyo.1990), and *Stephens v. State*, 774 P.2d 60 (Wyo.1989):

[PROSECUTING ATTORNEY]: Did you receive other information that caused ... you to believe Mr. Steiner—

· · · ·

[DEFENSE ATTORNEY]: It's inadmissible under the recent case of Bennett versus State.

THE COURT: Overruled.

[PROSECUTING ATTORNEY]: You may answer.

[DCI AGENT]: I received a fingerprint identification of Allen Craig Wells' left thumb having come in contact with a bag that contained the nearly five ounces of cocaine I found in Kevin Steiner's house.

■ Two rules emanate from *Bennett* and *Stephens*. First, the State may not elicit opinion testimony from any witness, lay or expert, concerning the guilt of the accused. *Bennett*, 794 P.2d 879; *Stephens*, 774 P.2d 60. Second, the State may not elicit from an expert witness his expert opinion regarding another witness' credibil-

ity. *Stephens,* 774 P.2d 60. *See also Montoya v. State,* 822 P.2d 363 (Wyo.1991); *Zabel v. State,* 765 P.2d 357 (Wyo.1988); and *Lessard v. State,* 719 P.2d 227 (Wyo. 1986). Both rules are prophylactic in nature. They preserve for the jury the responsibilities of resolving factual issues to determine guilt or innocence and of judging the credibility of witnesses. Neither rule was violated in the instant case.

The DCI agent was not asked about, and he did not express an opinion as to, Appellant's guilt. Nor did he offer an expert opinion concerning whether Steiner was a truthful witness. The DCI agent was merely asked to state a factual basis for believing Steiner after Steiner's credibility had been attacked by opposing counsel. The DCI agent did so. His testimony was relevant to the issue of Steiner's credibility and did not violate the *Bennett/Stephens* rules. The trial judge did not abuse his discretion by allowing the testimony.

Affirmed.

CARDINE, J., files a specially concurring opinion.

URBIGKIT, J., Retired, concurs in part and dissents in part and files an opinion.

CARDINE, Justice, specially concurring.

In *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1184–85, 68 L.Ed.2d 378 *reh'g denied* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981), the United States Supreme Court set down the rule which governs interrogation of an accused who has invoked his right to counsel:

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates fur-*

> *ther communication, exchanges or conversations with the police.* [emphasis added; footnote omitted]

The Court explained, in dicta, that an accused may waive his privilege against self-incrimination by voluntarily initiating a conversation concerning his alleged crime:

> In concluding that the fruits of the interrogation initiated by the police on January 20 could not be used against Edwards, we do not hold or imply that Edwards was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel. Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial.

*Edwards,* 451 U.S. at 485, 101 S.Ct. at 1885.

It further added this caveat, in a footnote:

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Id.,* 451 U.S. at 486, n. 9, 101 S.Ct. at 1885, n. 9.

This dicta was further developed in *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), cited by the majority in this case, in which the Supreme Court formulated a two-step inquiry for waiver under *Edwards:* (1) whether the defendant initiated the contact leading to his incriminating statement, and (2) if so, whether the prosecution has demonstrated

that "subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Bradshaw*, 462 U.S. at 1044, 103 S.Ct. at 2834. The Court held that when the defendant, while being transported to the county jail, asked the police "[w]ell, what is going to happen to me now?", his inquiry satisfied the first part of the test; it "evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship." *Bradshaw*, 462 U.S. at 1045–46, 103 S.Ct. at 2835. The Court also found the second part of the test satisfied under the circumstances.

Subsequent cases have reaffirmed the *Edwards/Bradshaw* rule that a defendant who knowingly and voluntarily initiates a conversation concerning his alleged offenses, may waive his privilege against self-incrimination, even after appointment of counsel. *See e.g., Minnick v. Mississippi*, 498 U.S. 146, ——, 111 S.Ct. 486, 492, 112 L.Ed.2d 489 (1990). In *Bradshaw*, the Supreme Court explicitly avoided a hypertechnical definition of "initiation":

> There can be no doubt in this case that in asking, "Well, what is going to happen to me now?", respondent "initiated" further conversation in the ordinary dictionary sense of that word. * * * [W]e doubt that it would be desirable to build a superstructure of legal refinements around the word "initiate" in this context * * *.

*Bradshaw*, 462 U.S. at 1045, 103 S.Ct. at 2835.

Application of *Bradshaw* must begin with an assessment of whether the defendant initiated, in the ordinary sense of the word, the conversation which led to his admissions. At the suppression hearing, Special Agent Wheeler stated the following concerning his conversation with appellant:

> Well, Mr. Wells just started the first conversation that had anything to do with the case by saying that he did know Kevin Steiner, and he had been to his house visiting but, you know, we had— that it was completely innocent * * *.

Appellant's statement to Wheeler initiated the conversation in which he incriminated himself. Our next inquiry must concern the knowledge and voluntariness of appellant's waiver. Again, at the suppression hearing, Agent Wheeler testified as follows:

Q. Was [appellant] Mirandized then?

A. * * * Special Agent Arter advised him of his rights per Miranda and then I heard Special Agent Arter tell him that we weren't going to ask him any questions, you know, we were just there to take him back, and he said okay.

> \*　　\*　　\*　　\*　　\*　　\*

Q. Any conversation that took place in the car on the way back, I'm going to ask you about when it commenced?

A. We drove out the county road and had just gotten on the freeway.

> \*　　\*　　\*　　\*　　\*　　\*

A. * * * So we were in the car maybe five or ten minutes, and that's when Mr. Wells just kinda said that, you know, he knew Kevin Steiner.

Q. Had anybody asked him anything up to this point?

A. No.

> \*　　\*　　\*　　\*　　\*　　\*

Q. Now up to that point in time has the defendant ever said, I don't want to talk, or I want my lawyer, or I want a lawyer or anything along those lines?

A. No.

Q. Did he indicate any misunderstanding of the Miranda warnings?

A. He indicated that he understood it, and he was specifically asked, Arter read the Miranda rights and then said, do you understand all of those and he said, yes, I do.

From this testimony, the trial court could properly conclude that appellant made a knowing and voluntary waiver of his privilege against self-incrimination. Thus, both prongs of the *Edwards* test are satisfied, and the evidence was properly admitted.

Next it is claimed that testimony of a special agent about information received

which caused him to believe a state's witness was violative of holdings in our *Stephens* and *Bennett* cases, *infra.* In *Stephens v. State*, 774 P.2d 60 (Wyo.1989), we held that reversible error was committed when expert witnesses testified to their opinion that a child had been abused and identified the perpetrator. Error was also committed when an expert witness vouched for the victim's credibility. This is because "jurors are as qualified as expert witnesses to determine the credibility of any witness, and * * * testimony commenting on the credibility of a witness is not admissible under Rule 704." *Stephens*, 774 P.2d at 68.

In *Bennett v. State*, 794 P.2d 879 (Wyo. 1990), an investigating officer testified he believed the defendant was a drug dealer, and gave reasons for his belief. We held that both the statement of the officer's opinion concerning guilt and his explanation of reasons for his opinion were an impermissible usurpation of the province of the jury.

I discern two rules from *Bennett/Stephens:* (1) no one (except perhaps the defendant) may testify concerning his opinion of whether the defendant is guilty of the crime charged, or of the basis of his opinion; and (2) no *expert* witness may give an "expert opinion" of a witness' credibility. Neither rule was violated here.

Agent Wheeler did not testify concerning his opinion of the defendant's guilt. All that was asked was whether Agent Wheeler received information during the course of his investigation that caused him to believe Kevin Steiner. Agent Wheeler responded:

I received a fingerprint identification of Allen Craig Wells' left thumb having come in contact with a bag that contained the nearly five ounces of cocaine I found in Kevin Steiner's house.

The prosecutor did not ask whether Wheeler believed appellant was guilty. *That* would have been an impermissible inquiry into an opinion of guilt. Of course the officer's testimony had some *bearing* on the ultimate question of guilt or innocence. If it had no bearing on that question, it would have been excluded as irrelevant. See W.R.E. 401, 402.

Nor did Agent Wheeler offer an expert opinion concerning whether Steiner, the state's witness, was telling the truth at trial. He was asked to give his reasons for believing Mr. Steiner, and he did so. If it was evidence that went to Steiner's credibility, it was not barred. Under W.R.E. 702 *expert* testimony on a victim's credibility is prohibited because it invades the province of the jury. *See Zabel v. State*, 765 P.2d 357, 360 (Wyo.1988); *Lessard v. State*, 719 P.2d 227, 233 (Wyo.1986). We prohibit such testimony because we do not need or want a parade of "truth or falsehood" experts invading the jury's traditional function by offering expert *opinions* of credibility. The same concerns are not present where "lay" testimony showing a factual basis for belief is used to bolster a witness's credibility after it has been attacked by the other side.

Prior to Wheeler's testimony, Steiner's credibility had been attacked by the defense. Steiner was a target of impeachment on the grounds that he had received favorable treatment from the government for his testimony. The defense elicited testimony that prior to his plea arrangement, he was facing a 120-year sentence for his part in this crime but that because of his arrangement with the prosecution, he would only serve ten months incarceration. The defense also pointed out that Steiner had changed his story from the "wild story" he told at the time he was arrested. Under the circumstances, Wheeler's testimony was relevant and needful to bolster Steiner's credibility.

In short, Agent Wheeler neither gave his opinion regarding appellant's guilt nor offered an expert opinion regarding Kevin Steiner's credibility. I agree that we affirm appellant's conviction, as he has presented no reversible error.

URBIGKIT, Justice, Retired, concurring in part and dissenting in part.

I concur in the result in finding no error by the trial court in denial of suppression for the telephone subscriber information.

However, my conclusion to reject error regarding the telephone numbers—address of where the telephone was emplaced, is in no way based upon *Saldana v. State*, 846 P.2d 604 (Wyo.1993). I dissented in *Saldana* and strongly believe that it is not only bad law, but an unnecessary and improvident attack on protections guaranteed in the Wyoming Bill of Rights provided in Wyo. Const. art. 1.

I do not find non-aural acquisition to be properly excluded from the Wyoming statute in constituting an appropriate test, under either constitution or statute, when we consider, generally, government invasion of the remaining emburdened citizen rights to privacy.

Law enforcement agents became involved in this case without any evidence that the telephone number for the manager of the residential apartments was unlisted, as in fact it was not. Whether the unlisted status of the second telephone number is significant will not be considered since it was not used in acquisition of information upon which the case was built.

What this case really demonstrates, and the reason for my concurrence, is that the address and listed user identification were readily available by looking at the usual reverse telephone directory that relates a name to a listed subscriber and the subscriber by name to address. What this case further demonstrates is that a simple call to anyone with a Denver, Colorado reverse directory could have provided the information, which is neither secret nor unpublished.

Additionally, as recognized by the district court, Allen Craig Wells had no privacy protected interest in the telephone number that was used to locate him. It was a listed office telephone number that was used and it does not raise the standing issue argued by Wells. The information regarding the address of the telephone number for the manager of the apartment complex was not private. It would be no different than if a public telephone booth had been used.

The Wyoming law enforcement personnel here, rather than using a simple and completely legal and appropriate method of user address identification, or just calling the number, resorted to a questionable violation of the Wyoming Constitution and its anti-wire tapping statutes, Wyo.Stat. §§ 7-3-601 through 7-3-611 (Cum.Supp.1992), by requesting federal agency intervention to subvert our law. Actually, if the federal agencies in Denver cannot directly utilize computer access by dialing into telephone company identification storage, the ultimate source of the identification may well have been their use of a published city directory. A simple call to the number from Cheyenne, Wyoming, which was done at a later date, would have been equally effective. This record did not actually show knowledge by the Cheyenne police of how the federal authorities acquired the address. Rather than going to the trouble of an "administrative subpoena," they may have looked in a directory or made a telephone call themselves, either to the telephone company or to the acquired number.

Nothing was obtained for this prosecution which was protected by any privacy concept where the information obtained was readily available by reading a book. Consequently, I concur without accepting any part of the *Saldana* warrantless invasion by a federal agency "Administrative subpoena" subterfuge. *See* Francis S. Chlapowski, Note, *The Constitutional Protection of Informational Privacy*, 71 B.U.L.Rev. 133, 160 (1991), which states:

> Personal information, an integral aspect of an individual's identity, is crucial to most theories of personhood. The personal interest can be protected from unwarranted governmental intrusions only by recognizing a constitutional right to informational privacy based on personhood. Furthermore, the nature of information in modern society requires that personal information also be treated as property. Thus, the due process clauses' protection of liberty and property mandate the constitutional right of informational privacy.

In Riley K. Temple and Michael Regan, *Recent Developments Relating to Caller*

*ID*, 18 W.St.U.L.Rev. 549, 557–58 (1991) (quoting Bellotti, Brant & Halprin, *The Developing Right of Privacy*, 1 J.Crim.Def. 457, 458 (1976); Warren & Brandeis, *The Rights to Privacy*, 4 Harv.L.Rev. 193 (1890); and *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928), Brandeis, J., dissenting) (footnotes omitted), the authors stated:

A recognized right of privacy is of fairly recent origin in American jurisprudence, and "[t]he notion that an invasion of privacy might be actionable in tort is of comparatively recent acceptance." A tort-based privacy right probably could be traced to the 1890 law review article of Louis Brandeis and Samuel Warren, which argued that "[i]n every such case the individual is entitled to decide whether that which is his shall be given to the public. No other has the right to publish his productions in any form, without his consent." The article concluded that public revelation of private information without the private individual's consent, should be actionable in tort. In his famous dissent in *Olmstead v. United States*, Justice Brandeis suggested that the rights of privacy specifically included "the right to be let alone." More recently, the courts have determined that there are constitutionally protected "zones of privacy" in which individuals have an "expectation of privacy."

As those authors recognized, and other authorities have considered, Dean William L. Prosser provided the expansive evaluation in dividing the privacy right into four categories. These include: (1) public disclosure of private facts for anticipated personal gain; (2) publicity that places the person in a false light in the public eye; (3) public disclosure of private information; and (4) offensive intrusion upon a person's right to be left alone. William L. Prosser, *Privacy*, 48 Cal.L.Rev. 383, 389 (1960). *See* Glenn Chatmas Smith, *We've Got Your Number! (Is It Constitutional to Give It Out?): Caller Identification Technology and the Right to Informational Privacy*, 37 UCLA L.Rev. 145 (1989). *See also Barasch v. Pennsylvania Public Utility Com'n*, 133 Pa.Cmwlth. 285, 576 A.2d 79 (1990), *aff'd* 529 Pa. 523, 605 A.2d 1198 (1992), where the court reversed the order of the Pennsylvania Public Utility Commission which authorized Caller*ID service. The court found that the service, in either blockable or unblockable format, violates the privacy rights of the people of the state. The court further said: "In the framework of a democratic society, the privacy rights concept is much too fundamental to be compromised or abridged by permitting Caller*ID." *Id.* 576 A.2d at 89.

Hence, consumers of telephone service should not suffer an invasion, erosion or deprivation of their privacy rights to protect the unascertainable number of individuals or groups who receive nuisance, obscene or annoying telephone calls which can already be traced or otherwise dealt with by existing services provided by Bell.

*Id.*

The acquisition of the address, by use of the apartment manager's listed telephone number, does not raise any of these privacy issues sufficient to require suppression of evidence consequently obtained. However, I respectfully dissent from the conclusion that Wells improvidently, in the absence of counsel, initiated the conversations in the automobile while he was being brought back to Cheyenne by the special drug agents for extradition. I find a direct and specific contradiction in comparing this majority decision to the recent United States Supreme Court case of *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). Unfortunately, this case follows the many other recent cases where all of the facts are not fully disclosed in the appellate record, *e.g.*, *Goettl v. State*, 842 P.2d 549 (Wyo.1992), Urbigkit, J., dissenting.

The events resulting in this conviction allegedly occurred on August 15, 1989, amended by the district court to August 13 and September 4, 1989. A warrant for arrest was issued December 13, 1989 and Wells was then apparently arrested in the Aurora, Colorado area on December 19, to be held in jail until extradited on February 20, 1990. While in confinement in the

Arapahoe County jail, Wells arranged for filing an affidavit for a Wyoming attorney which resulted, on February 20, 1990, with the appointment of a public defender by the county court of Laramie County, Wyoming.

What happened regarding extradition is not clearly disclosed in this record, but it appears that a Governor's warrant was issued and, on March 27, 1990, two special drug agents, Special Agent Wheeler and Special Agent Arter, as a favor for the Laramie County deputy sheriff who normally handles extraditions, went to the Arapahoe County jail to secure the prisoner for extradition. It is what occurred during the automobile trip that provides the basis for my dissent. One of the extraditing officers was Steve Wheeler, who had originally worked on the case as a Cheyenne police officer and then continued thereafter following a transfer to the state drug enforcement agency. The second person was Special Agent Arter of the same agency. At a suppression hearing before the district court in Laramie County, the questioning regarding knowledge of representation was asked and answered:

Q. [Assistant Public Defender] On March 27th, the day that Mr. Wells was extradited from Fort Collins to here, did you know that I was representing him at that point?

A. [Steve Wheeler] No, I didn't.

Q. Okay. You filed a report with regards to what happened during that extradition, didn't you?

A. Yes, I did.

Q. Okay. And at the bottom of this report—it's dated the 27th—March 27, 1990, so let me hand you this. So is that report dated the same day that the extradition took place?

A. The date of the report is the 27th of March, the date it was typed was the 29th of March, so, yes.

Q. Okay. So is all the information that is in that record information that you knew on the 27th?

A. Yes, this is a report of what occurred during the extradition of Allen Wells.

Q. Okay. And you knew all of that information that you included in that report as of the evening of the 27th or so?

A. That's correct.

Q. Okay. Oh, could you read the last line of that, please?

A. A preliminary hearing in the case of Allen Wells is set for April 3, 1990, in Laramie County Court. Wells will be represented by David Lindsey.

Q. So was that something you did on the 27th or did you add that in later?

A. The report was typed on the 29th. So sometime before the 29th when that report was typed I learned when the hearing was set and that you are representing him.

Q. But you don't know when I was appointed to represent Mr. Wells, do you?

A. No, I do not.[1]

It is noteworthy that the answer exactly follows the question and no doubt was correctly stated that Special Agent Wheeler did not know that *Assistant Public Defender Lindsey* was representing Wells, not that he may well have known that an appointed attorney had been named for representation by the Wyoming court. We are not provided computer run off information from either the sheriff's office or the county attorney's office to establish whether either or both offices maintained file information prior to March 27, 1990 that representation had been requested and that

---

1. The specific order appointing counsel did not name the Assistant Public Defender, David Lindsey, as the *member* of the Public Defender's office as counsel for Wells. The order stated:

    I certify that the above named defendant charged with a violation of Wyoming Statute 35–7–1031(a)(i)—35–7–1016(b)(iv)—1 ct. and 35–7–1042—1 ct. and appeared before me this date without counsel, alleged to be unable to employ counsel, and requested appointment of counsel for proceedings before this Court. The Court having determined the defendant to be needy as required by Wyoming Statute,

    IT IS HEREBY ORDERED that the Public Defender's Office be appointed to represent the defendant in all proceedings before the County Court and all future proceedings unless this order be rescinded with due cause by the Court or District Court.

counsel had been appointed by the court on February 10, 1990.

We chase the frontiers of supposition in this record in stating that Special Agent Wheeler and Special Agent Arter just accidentally happened to make the extradition trip from Aurora to Cheyenne and did not know that some attorney had been appointed for Wells after an apparent contested extradition proceeding in Colorado and then happened to not interrogate by a specific question to find out from Wells whether he had counsel.

Wells was asked about the subject matter of interest to the two special agents by explicit questions:

Q. [Assistant Public Defender] Okay. During the course of that extradition you had a conversation with Mr. Wells, didn't you?

A. [Steve Wheeler] Yes.

Q. Okay. And you had occasion to ask Mr. Wells some questions during that conversation, didn't you?

A. Not really.

Q. In the third paragraph of your report, can you read the first highlighted sentence for me, please?

A. Special Agent Wheeler asked how his fingerprints would have gotten on the cocaine.

Q. So that seems like you asked a question to me, am I interpreting that wrong?

A. I asked a question but it was in response to something he said to me.

Q. All right. Well, I didn't ask you if it was in response to something. Let me ask you this: You had a conversation with Mr. Wells, correct?

A. Yes, I did.

Q. Okay. And during this conversation, even though Mr. Wells initiated it, you asked him questions, didn't you?

A. Yes, I did.

Q. Okay. And I think we have already covered the first question that you asked him, but let's redo it. Did you ask him if—or how his fingerprints might have got on a package of cocaine that was found at Mr. Steiner's house?

A. Yes, I did.

Q. And what was his response?

A. He said maybe he had his lunch in some sandwich bags and he ate his lunch and then Steiner had put cocaine in the sandwich bags after he had eaten his lunch.

Q. Okay. And after he responded with that did you ask him another question?

A. Yes.

Q. Okay. And was that question: Special Agent Wheeler then asked Wells how he knew that the cocaine was in sandwich bags?

A. That's correct.

Q. Okay. And how did Mr. Wells respond to that question?

A. He became kind of upset and flustered and got quiet for awhile.

Q. Okay. Do you remember if you asked Mr. Wells any other questions?

A. I don't recall specifically.

Q. Okay. In your report it says that S.A. Wheeler asked who ended up with all of the money that Steiner gave him. Do you remember asking that question?

A. Yes, I do.

Q. And what did Mr. Wells respond with?

A. He said he had never received any money ever at all from Kevin Steiner.

Q. Okay. Did he give you any explanation as to why some certain money orders might have been made out to him by Kevin Steiner?

A. After—after he made that statement I asked him what about the Western Union money orders and he said, had Kevin told you I bought an engine from him or something like that.

Q. All right. And did you ask him another question after that?

A. Yeah, I asked him why it was that he would buy an engine from Kevin and Kevin would give him the engine and also send him some money.

Q. And how did Mr. Wells respond to that?

A. Well, again he didn't quite know what to say.

Q. All right. What was your purpose in asking Mr. Wells all of these questions?

A. My purpose was to respond to statements or questions that he asked us and to see how he would react.

Q. Uh-huh. Were any of his reactions or answers helpful to your investigation of this case?

A. Oh, he didn't tell me anything I didn't already know.

Q. All right. Did you find some of his statements or reactions to be incriminating?

A. Certainly.

MR. TRISTANI: Objection, Your Honor. That's up to the fact finder or the jury or a court whether it is incriminating or exculpatory.

THE COURT: Overruled. He may answer.

A. I thought so.

Q. (By Mr. Lindsey) And why was that?

A. Well, in my opinion I caught him with his pants down.

Q. Uh-huh. What do you mean by that?

A. Out of the blue he knew the cocaine was in sandwich bags; that is a fact that only investigators in this case knew, no one else.

Q. Okay.

A. His explanation for receiving money from Kevin Steiner was that he bought something from Kevin Steiner; that's ludicrous.

Q. Did he appear to be covering his guilt when, as you say here, Wells appeared to become frustrated and quit talking for several minutes; would that be your impression of what he was doing?

A. My impression was he knew he had been caught with his pants down and he had to think for a while.

There is nothing in this record that reveals Wells initiated discussion while he was involuntarily in the car to be returned to Cheyenne by the two officers. Like the Mississippi deputy sheriff in *Minnick*, 498 U.S. at ——, 111 S.Ct. at 489, Wells was reminded of his Miranda rights and did not sign a waiver form.

From that time, this case explicitly fits the course of events detailed in *Minnick*. Conversations "developed during the ride back to Cheyenne." In the course of those conversations, Wells gave incriminating answers. The one question never asked, according to the record, was whether Wells had an attorney, or for that matter, wanted an attorney to assist him during the session underway while he was being involuntarily returned to Cheyenne for extradition.

In application of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as reinforced by *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and now determinatively defined in *Minnick*, 498 U.S. at ——, 111 S.Ct. 486, the interrogation of the accused, while in the close, confining control of the officers, in the absence of counsel, and on the extended trip from Aurora, Colorado to Cheyenne, should have been ordered suppressed at the suppression hearing. Wells had not instigated contact within the purview of *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). He was no doubt taken in handcuffs, and probably leg irons, from the Arapahoe County jail and placed in a car for the transportation to Wyoming. Subsequent events, as far as this record reveals, demonstrate skillful interrogation which elicited highly incriminating testimony, all done in the absence of appointed counsel. That counsel probably had not even been advised about the scheduled trip by the drug investigators to bring his appointed client to the Cheyenne jail.

Denial of the suppression motion for this testimony elicited during the trip constitutes reversible error under *Minnick; Edwards*, and *Miranda*.

I respectfully dissent.