2003 WY 116

### Charles M. SEWARD, Appellant (Defendant),

v.

### The STATE of Wyoming, Appellee (Plaintiff).

### No. 02–125.

Supreme Court of Wyoming.

Sept. 16, 2003.

Representing Appellant: Kenneth M. Koski, Public Defender; Donna D. Domonkos, Appellate Counsel; Marion Yoder, Senior Assistant Public Defender; and Barbara A. Parnell, Assistant Appellate Counsel.

Representing Appellee: Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Julie Nye Tiedeken, Special Assistant Attorney General; and Sean W. Scoggin, Special Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] In November 2001, a jury found Charles Michael Seward (appellant) guilty of one count of second-degree sexual assault in violation of Wyo. Stat. Ann. § 6–2–303(a)(v) (LexisNexis 2003) and one count of third-degree sexual assault in violation of Wyo. Stat. Ann. § 6–2–304(a)(iii) (LexisNexis 2003), both felonies, for sexually assaulting his three-year-old granddaughter. The district court sentenced appellant to imprisonment for seven to ten years for second-degree sexual assault and ten to fifteen years for third-degree sexual assault. It ordered that these sentences be served consecutively, but suspended the second sentence upon appellant's release from confinement on the first sentence and conditioned the suspended sentence upon appellant successfully completing supervised probation for up to ten years. Appellant appeals from that judgment and sentence. We reverse.

## ISSUES

[¶ 2] Appellant raises the following issues on appeal:

*ISSUE I*

Whether the admission of expert testimony which impermissibly vouched for the credibility of the child witness was reversible error per se?

*ISSUE II*

Whether the trial court abused its discretion by finding the child witness competent to testify, and by denying the defendant the opportunity to present pretrial testimony indicating the child's statements were tainted? Whether the child's incompetency to testify violated the defendant's right to the opportunity for effective cross-examination under the confrontation clause of the Wyoming Constitution and the confrontation clause of the United States Constitution?

*ISSUE III*

Whether the district court abused its discretion when it excluded extrinsic evidence of a prior inconsistent statement of a witness?

The State phrases the issues in substantially the same manner.

### FACTS

[¶ 3] On December 12, 2000, the victim and her mother, Crystal Barbee (Barbee), resided with Barbee's fiancé in Fort Collins, Colorado. The fiancé testified that the victim, three years and ten months of age at the time, disclosed "out of the blue" that her "grandpa Michael" (appellant is the victim's paternal grandfather) let her rub lotion on his "lollypop," and that her grandpa also licked her "cookie." The fiancé understood the term "lollypop" to mean "penis" and the term "cookie" to mean "vagina" (Barbee confirmed this). He telephoned Barbee at work and had the victim repeat what she had disclosed over the telephone. Barbee testified that her fiancé called her at work that night, put the victim on the telephone, and the victim stated that she put lotion on her grandpa's "lollypop" and her grandpa licked her "cookie" and "she didn't like it." Barbee immediately drove the victim to the police department in Cheyenne.

[¶ 4] The victim, nearly four years and ten months of age at the time of trial, testified at trial. She recalled attending the Christmas parade in Cheyenne with her father, stepmother, and appellant,[1] and that at some point, when her father, grandmother and other family members were at work, she put lotion that she had found in the bathroom of her grandpa's house in Cheyenne on her "grandpa's dick" or "lollypop" and her grandpa also removed her panties and "licked" her "cookie" on the bed. The victim identified the respective body parts she was referring to on anatomically correct male and female drawings, and also identified appellant as her "grandpa," who she had rubbed lotion on. Witness testimony revealed that the victim often refers to appellant as "grandpa" and her maternal grandfather as "papa."

[¶ 5] Detective Ray Bilkie (Bilkie) of the Cheyenne Police Department interviewed appellant on two occasions. In the first interview, appellant essentially denied his involvement and provided information implicating the victim's maternal grandfather. After a "forensic interviewer" interviewed the victim and the victim identified appellant from a photo array that included both grandfathers, Bilkie interviewed appellant a second time. At this second interview, according to Bilkie, appellant stated that he was a "heavy drinker" at the time of the incident, that he did not recall drinking that day, but that if the victim "says I did it, then I must have. I just don't remember it" or "if [the victim] says this happened, [appellant] may have done this to her, but he just specifically doesn't remember."

[¶ 6] Appellant also testified at trial. According to appellant, age fifty-three at the time of trial, the victim asked if she could take a bath the day of the incident. Appellant ran her bath water. The victim emerged from the bath, appellant put a t-shirt on her, and the victim went to a bedroom and returned with a bottle of baby lotion. According to appellant, the victim asked him to put lotion on her, and he put some on her arms and around her neck. She

---

1. Barbee recalled that sometime after Thanksgiving in 2000, the victim visited the Sewards to attend the Christmas parade in Cheyenne. Information from other witnesses placed the visit during the weekend of November 25, 2000.

reportedly then asked him to "put it on, on my cookie." Appellant replied "No, I won't," and the victim responded "Well, my papa does," and appellant again replied "Grandpa's just don't do things like that."

[¶ 7] When the victim's stepmother returned to the residence, appellant informed her that she needed to ask the victim what the victim had previously told appellant. The victim was, according to appellant, reluctant at first because she said her "papa will go to jail." The victim then told the stepmother what she had previously disclosed to appellant, and also later spoke with appellant's wife. Appellant recalled stating to Bilkie that "Well, I guess if, if [the victim] says I did, I guess I must have done something," but that he said this "sarcastically" after repeatedly denying Bilkie's allegations, hoping the detective would "leave [him] alone." He testified that he only drank one beer the entire weekend, and that was the evening following the victim's disclosure. Cassette tapes of Bilkie's interviews with appellant were inadvertently destroyed prior to trial.

[¶ 8] The victim's stepmother testified that when she returned to the residence that day, appellant told her that she needed to talk to the victim, and in the course of doing so, the victim stated that her "papa" puts "lotion on her cookie, and she puts lotion on his lol[l]ypop." When the victim's father returned to the residence that day, he also spoke with the victim alone in a separate room, and she responded similarly and differentiated between appellant and her maternal grandfather. Appellant's wife provided similar testimony regarding her own conversation with the victim that day.

[¶ 9] According to the victim's father, Barbee asked him a "couple months" before the incident to relinquish his parental rights to the victim so that Barbee's fiancé could be the victim's father. The father declined.

## DISCUSSION

### FORENSIC INTERVIEWER'S TESTIMONY

[¶ 10] In his appellate brief, appellant argues that the testimony of Lynn Story Huy-

lar (Huylar), a "forensic interviewer," impermissibly vouched for the victim's credibility. At oral argument, appellant also generally contended that the district court erred by admitting into evidence Huylar's videotaped interviews with the victim as prior consistent statements pursuant to W.R.E. 801(d)(1)(B). According to appellant, other authority[2] provides good reasoning concerning whether, despite our precedent, a temporal requirement should be applied in admitting such evidence, and that admitting Huylar's testimony and her videotaped interviews with the victim essentially resulted in a "parade of witnesses." However, appellant's oral argument did not precisely apply either the rule's requirements or the referenced authority to the particular circumstances and nuances of the instant case.

[¶ 11] In response to the vouching issue, the State asserts that Huylar did not opine in her testimony that the victim was credible or truthful, but assisted the jury in "understanding the interview process," the "ability of a child of this age to communicate," and the "behavioral characteristics of sexual misconduct victims...." According to the State, this testimony did not directly comment on the victim's truthfulness, "notwithstanding that information concerning the child's ability to communicate had the likely incidental effect of enhancing the child's credibility."

### STANDARD OF REVIEW

[¶ 12] Appellant's trial counsel filed a pretrial motion to exclude the victim's statements to several witnesses, including Huylar, as hearsay. At a motion hearing, the prosecutor argued that the victim's statements were admissible as prior consistent statements pursuant to W.R.E. 801(d)(1)(B), but appellant's trial counsel did not specifically object to any witness' testimony other than Huylar's. At trial, appellant's counsel renewed his objection that the substance of Huylar's interviews with the victim were inadmissible and objected specifically to Huylar commenting beyond the substance of any such interviews. Appellant's trial counsel

2. Appellant specifically referenced *Tome v. United States,* 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995) in addition to other regional authority.

apparently did not object at trial to either Barbee's testimony or that of her fiancé. At oral argument, appellant's contentions similarly appeared to focus on Huylar's testimony.

[¶ 13] The district court ruled that the victim's statements to Huylar were admissible pursuant to W.R.E. 801(d)(1)(B) to rebut "expressed and implied charges of improper influence, motivation," although according to the district court, it was "ambiguous [at that time] whether the alleged improper influence or motive antedated the prior consistent statement...."[3] The district court found that Huylar could testify to the foundation for taking the victim's statements, in addition to her "approach and technique, and the reasons for it."

Rulings on the admissibility of evidence are committed to the sound discretion of the district court and are not subject to appellate second guessing absent an abuse of discretion.

*Curl v. State*, 898 P.2d 369, 373 (Wyo.1995). We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. *Griswold v. State*, 2001 WY 14, ¶ 7, 17 P.3d 728, ¶ 7 (Wyo.2001). Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Id.* "In the absence of an abuse of discretion,

we will not disturb the trial court's determination." *Id.* The burden is on the defendant to establish such abuse. *Trujillo [v. State]*, 2 P.3d [567] at 571 [(Wyo.2000)].

"If the trial court erred by admitting evidence, we then must ascertain whether the error affects any substantial rights of the accused, providing grounds for reversal, or whether it is harmless. The harmless error standard is set out in W.R.A.P. 9.04:

'Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court.'

*See also* W.R.Cr.P. 52. An error is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred. To demonstrate harmful error, the defendant must show prejudice under 'circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play.' *Johnson v. State*, 790 P.2d 231, 232 (Wyo.1990)."

*Solis [v. State]*, 981 P.2d [34] at 36 [ (Wyo.1999)] (some citations omitted); *see also Ryan v. State*, 988 P.2d 46, 52–53 (Wyo.1999)."

*Skinner v. State*, 2001 WY 102, ¶ 25, 33 P.3d 758, 766–67 (Wyo.2001), *cert. denied*, 535 U.S. 994, 122 S.Ct. 1554, 152 L.Ed.2d 477 (2002).[4]

---

**3.** The trial testimony appears to indicate that an alleged motive to fabricate based on Barbee's desire that the victim's father relinquish his parental rights arose approximately two months prior to the victim's disclosure to Barbee's fiancé. Appellant's trial counsel did not follow through at trial regarding any allegations that Huylar improperly questioned the victim. If the prior consistent statement was made subsequent to when the improper influence arose, the statement may only be used for rehabilitative purposes. *Frenzel v. State*, 849 P.2d 741, 751 (Wyo.1993), *cert. denied*, 522 U.S. 959, 118 S.Ct. 388, 139 L.Ed.2d 303 (1997). "Because of the limited purpose for which the statement may be offered, the party contesting admission of the statement is entitled to a limiting instruction to that effect." *Lancaster v. State*, 2002 WY 45, ¶ 15, 43 P.3d 80, 87–88 (Wyo.2002).

The district court offered, if appellant requested, to give a limiting instruction "to the effect that the statement or statements are admitted for the limited purpose of evaluating the [victim's] credibility...." Instruction No. 7 to the jury provided:

The video-taped interviews of [alleged victim's name] by Mrs. Huyl[a]r were admitted into evidence only to assist you to evaluate the credibility of the child's testimony as given at the trial. It is not to be seen as direct evidence.

Appellant does not argue that this jury instruction was deficient.

**4.** We do not "apply the error per se standard in reviewing a claim that a witness improperly vouched for the credibility of another witness." *Burton v. State*, 2002 WY 71, ¶ 38, 46 P.3d 309, 319 (Wyo.2002).

APPELLANT'S W.R.E. 801(D)(1)(B) ARGU-
MENTS

[¶ 14] We recognize that the State did not have an adequate opportunity to respond to the additional issues appellant raised at oral argument, but we choose briefly to comment on appellant's general arguments. First, in our recent precedent, we have specifically decided not to follow the reasoning of the authority cited by appellant regarding the application of a temporal requirement in admitting prior consistent statements pursuant to W.R.E. 801(d)(1)(B).[5] In *Cook v. State,* 7 P.3d 53, 58 (Wyo.2000), we stated the following:

> We expressly stated in *Makinen* [*v. State,* 737 P.2d 345, 349 (Wyo.1987)] that the rule was not limited to statements made before the advent of an allegedly improper motive, as Cook suggests here. *Id.* We recently affirmed that position in *Dike v. State,* 990 P.2d 1012, 1024 (Wyo.1999).

Cook contends that our holding in *Makinen* has been superseded by the United States Supreme Court's opinion in *Tome v. United States,* 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). In *Tome,* the Supreme Court held that F.R.E. 801(d)(1)(B), after which our rule is patterned, allows only those prior consistent statements made prior to the alleged fabrication or improper influence or motive. *Tome,* 513 U.S. at 159–60, 115 S.Ct. at 702, 130 L.Ed.2d at 583–84. We acknowledge that federal court interpretations of federal rules are highly persuasive in our interpretations of analogous Wyoming rules. *Kimbley v. City of Green River,* 642 P.2d 443, 445 n. 3 (Wyo.1982). However, the decision in *Tome* was not based on a constitutional issue and is, therefore, not binding upon this court, which is the final authority on this state's court rules.

This court determined in *Dike* that post-motive consistent statements are admissible for the purpose of evaluating the credibility of the declarant who testifies at trial.

We further held that the defendant is entitled to a limiting instruction to that effect, if he or she so requests. *Id.* at 1024. *See also Lancaster v. State,* 2002 WY 45, ¶¶ 13–18, 43 P.3d 80, 87–89 (Wyo.2002).

[¶ 15] Second, we note that prior consistent statements, when admitted under W.R.E. 801(d)(1)(B) to rehabilitate a witness whose credibility has been impeached in the particular manner described in the rule, may be prejudicial. *See Lancaster,* 2002 WY 45, ¶ 27, 43 P.3d at 92–93. Prior consistent statements are governed by the general principles of relevancy found in W.R.E. 401, 402, and 403, and are not admissible without limitation. Further, repetitious testimony of prior consistent statements offered for rehabilitative purposes is not always admissible:

> If the corrupting influence did in fact precede the statements, probative value is greatly diminished.
>
> "* * * Evidence which merely shows that the witness said the same thing on other occasions when his motive was the same does not have much probative force 'for the reason that repetition does not imply veracity.'"

*Stephens v. State,* 774 P.2d 60, 72 (Wyo.1989) (*quoting* 4 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 801(d)(1)(B)[01] at 803–150 to –151 (1987)).

[¶ 16] We continue to observe that prior consistent statements are relevant for consideration when their admission will provide a whole picture for the jury to determine whether there was any real inconsistency. Generally, post-motive statements are not significantly probative, and admitting a statement that merely repeats in-court testimony can, depending on the circumstances, have minimal impact on a trial. However, where there is a proper objection, the trial court should consider whether having numerous authority figures trained to recognize sexual abuse appear at trial is actually a trial

---

5. W.R.E. 801(d)(1)(B) provides, in pertinent part:
   (d) *Statements which are not hearsay.*—A statement is not hearsay if:
   (1) Prior Statement by Witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive ... [.]

strategy of preparing a multitude of self-serving, biased, inflammatory, video, audio, and written statements for trial; having the witness testify; and then introducing into evidence these consistent statements made prior to testifying. *See Baum v. State*, 745 P.2d 877, 882 (Wyo.1987) (Cardine, J. and Urbigkit, J., specially concurring). Such a trial strategy could render the statements irrelevant and unfairly prejudicial, particularly if the consequence of repeating the same testimony several times unduly emphasizes that testimony over all other testimony in the case.[6]

[¶ 17] Given that the purpose of a "forensic interview" is, according to Huylar, an "assessment process" regarding whether, based upon the information the victim provides during such an interview, the victim's disclosure is indeed credible, and that it is evident from this case, and other recent cases, that expert forensic interviews are being conducted for introduction at trial pursuant to W.R.E. 801(d)(1)(B), the district court should, in deciding to admit such evidence in the face of a proper objection, carefully consider how these factors affect the legitimacy of the interviews as prior consistent statements, as well as their probative value. We do not mean to question the legitimacy of statements introduced during expert testimony for some other proper purpose or according to another aspect of the hearsay rule.

VOUCHING ISSUE

[¶ 18] Huylar, a "forensic interviewer," former supervisor of the Department of Family Services' Child Abuse Investigation Unit, and current project director at a child advocacy center, interviewed the victim on December 18, 2000, and again on February 5, 2001.[7] According to Huylar, a "forensic interview" is

a way to obtain the information from a child that is in a nonleading manner, that is open, that still respects the integrity of the investigation and preserving evidence, and does It's an assessment process.

It's assessing what the child is giving to you based upon certain criteria, and then assessing it based upon those criteria to whether or not the, the disclosure was credible or not.

The "protocol" for such an interview includes building a "rapport" with the victim and his or her family, a general "developmental" assessment of the victim, whether the victim understands the difference between the truth and a lie, establishing whether the victim is aware of why he or she is there (this helps in "assessing their statements from that point on"), and engaging the victim in "normal conversation" followed by "very specific" formal questioning regarding the incident at issue. Huylar videotaped her interviews with the victim in the instant case, and both videotapes were played for the jury.[8]

[¶ 19] On direct examination, the following colloquy occurred between the prosecutor and Huylar:

Q. And whenever you, when you did these interviews with [the victim], did you undertake to evaluate the information that she was able to provide you?

A. Yes, I did.

Q. And what was the most critical as a forensic interview[er] for you to be evaluating?

A. Probably the most critical for me when I'm evaluating the child's interview and disclosure is the contextual details that they can give me. And when I'm, when I'm talking about "contextual," I'm talking about those unique details that a person only who has witnessed something could give me.

There are those details like: How did it feel? How did it smell?

---

6. Recent cases indicate that, as interpreted by this Court, W.R.E. 801(d)(1)(B) is susceptible to misuse. Should such misuse continually pervade future cases, this Court may be required to revisit the temporal requirement issue.

7. Huylar testified that the Cheyenne Police Department requested the second interview in order to get "some more specific information relating to the disclosure, and to clarify some details that

were got in the first interview," primarily the "detail of who exactly had touched her; who that person was."

8. It appears that the videotapes were played in their entirety. We recently addressed that issue in *Lancaster*, 2002 WY 45, ¶¶ 8–30, 43 P.3d at 86–93.

What did it look like? Did, did somebody interrupt the process?

They're very specific details, and only a person that has witnessed them would be able to give those to me. . . .

. . .

Q. And when you do these interviews, do you then prepare a report?

A. I do.

Q. And do you have a format for how you put that into report fashion and what you specifically note?

A. I've, I do. The, the tapes that I then record, I then take and I write a report verbatim off of, off of those tapes.

And in those I am then doing the assessment part of the interview. I'm looking for elements of coaching.

I'm looking for elements of contextual details. I'm looking for other elements that would support it either being a credible disclosure or a noncredible disclosure.

Q. Okay, and did you, in fact, make note of the, that assessment in your report on the interviews you did with [the victim]?

A. I did.

. . .

Q. Significant to you that each time she identified "Grandpa" she was clear who she was talking about?

A. Yes, because it showed consistency. She was very consistent, and at no time did she have confusion when she was asked specifically about who did what.

It was always that particular grandpa.

Q. Okay. Did you make note of each of the contextual details you indicated you earlier were evaluating throughout the interview process in your report?

A. I did. I did.

Q. The ones that were of significance? In the second interview, was there something of significance that you particularly found?

A. Well, she had a few more contextual details. She was able to now say whose lotion it was, and she named [her stepmother], who is a known person to her dad and lives in that home.

So that was significant. . . .

She talked about—She could do sequentially what she did, what happened next. And she talked about going and getting the lotion and then bringing the lotion back, and where she got it off the counter.

Those are really significant because, again, for a three- and a four-year-old, those are pretty heavy-duty details. She'd have had to have some kind of experience to be able to describe that.

Q. And you noted each of those in your assessment and in your report?

A. I did.

Cross-examination by appellant's trial counsel addressed primarily claimed inconsistencies in the victim's answers to Huylar's questions. On redirect by the prosecutor, Huylar testified as follows:

Q. . . . [Appellant's trial counsel] was essentially indicating that you described, that you asked questions to evaluate a child's ability to give contextual details. And he says, "Well, you didn't get her to say she knew what it felt like or smelled like."

What contextual details did you obtain that you felt were significant?

A. In the scheme of things you can't, you know, I, you can't say that you will have all of those elements in order for it to be credible. So I look for a broad range of things that would be contextual, and I found quite a few.

In terms of that she was just wearing a top and he was wearing pants, and then the detail that she described there was that it popped out. That was a real contextual detail she'd have been able to witness to have been able to describe that.

That the lotion smelled like shampoo; that she had to rub it on his lollypop, and that she was licked; and that Grandpa liked it but not with the poo-poo on it. Those are contextual details that she gave that supported the conclusion.

In closing argument, the prosecutor stated the following:

[Y]ou have evidence that [the victim's] Statements are not only reliable; they are consistent; they are detailed, and with contextual detail; a description provided of

her real-life experience, her real-life sexual abuse at the hand of this man, her grandpa . . .

. . .

. . . And it is what [the victim] reported that she consistently, clearly, and with her three-year-old detail said to Lynn Huylar in the taped interviews.

After listing several details from the victim's interviews with Huylar, the prosecutor continued:

All of these three- to four-year-old contextual details. Remember, [the clinical psychologist] explained the significance.

The prosecutor argued the following during rebuttal argument:

[A]nd you, with your life experience, know how to evaluate the weight of the testimony given. And you are allowed to believe your four-year-old [victim] because you know that when you hear a child in their contextual detailed setting explain to you what happened to them, that that's the best way to refute somebody's testimony.

And you know, based on everything that you've heard, that [the victim] has no motive to lie, and would have had absolutely no way to tell a consistent, detailed account of what her grandpa did to her unless she had a life experience to be describing. . . .

. . .

. . . Remember all of those contextual details, Ladies and Gentlemen.

Remember what [the victim] tells you, what she told you happened, what her grandpa did. Her grandpa is guilty.

In *Zabel v. State*, 765 P.2d 357, 360 (Wyo. 1988), we said:

It is well established in Wyoming that an expert witness cannot vouch for the truthfulness or credibility of an alleged victim. *Lessard v. State*, Wyo., 719 P.2d 227, 233 (1986). In *Lessard*, we explained

that the question of credibility is for the jury, who are themselves expert in that area. Consequently, the testimony of a psychologist or other expert on the issue of credibility does not assist them and therefore does not satisfy the requirements of Rule 702, W.R.E.[9]

One additional reason we "prohibit such testimony [is that] we do not need or want a parade of 'truth or falsehood' experts invading the jury's traditional function by offering expert opinions of credibility." *Wells v. State*, 846 P.2d 589, 598 (Wyo.1992) (Cardine, J., specially concurring) (emphasis omitted). However, testimony assisting the jury "in understanding some aspect of the testimony of another witness that does not comment directly on that witness' credibility or veracity is not invasive of the role of the jury." *Saldana v. State*, 846 P.2d 604, 618 (Wyo. 1993).

[¶ 20] We conclude that Huylar's "truthfulness criteria" testimony and her assessment of the victim's credibility based on the content of the victim's interview responses directly vouched for the victim's credibility. It is evident that the purpose of Huylar's testimony was twofold: establish the foundation for admitting her videotaped "forensic interviews" with the victim and assess the credibility of the victim's disclosure based on the content of those interviews. According to Huylar, the very purpose of a "forensic interview" is to assess whether the victim's disclosure was "credible or not"—a forensic interviewer is looking for "elements that would support it either being a credible disclosure or a noncredible disclosure." In evaluating the information the victim provided, the "most critical" factor, according to Huylar, is whether such information contains "contextual details," or "those unique details that a person only who has witnessed" them could provide. Specifically, Huylar was asked to describe what "significant" contex-

9. Both parties refer to Huylar's testimony as "expert" testimony pursuant to W.R.E. 702, and appellant does not question Huylar's qualifications. W.R.E. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In addition, W.R.E. 704 states:

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

tual details the victim provided during the interviews. Huylar did so and testified that she "found quite a few" contextual details that supported her "conclusion," a conclusion she based solely on the content of, indeed the extent of, the "contextual details" contained in the victim's responses. As to the significance of these details, Huylar stated that "for a three- and a four-year-old, those are pretty heavy-duty details," the victim would "have had to have some kind of experience to be able to describe that," and that one particular "contextual detail" was a "real contextual detail [the victim would] have been able to witness to have been able to describe that."

[¶ 21] Huylar's testimony in the instant case is nearly identical in nature and extent to the testimony we found impermissible in *Zabel* and quite similar to the objectionable testimony in *Wilde v. State*, 2003 WY 93, ¶¶ 17–18, 74 P.3d 699, 708–09 (Wyo.2003), a case also involving Huylar's testimony. In *Zabel*, 765 P.2d at 358, the victims were ten and thirteen years of age, and Zabel was charged with four counts of taking "immodest, immoral and indecent liberties with a minor." A clinical psychologist who evaluated both victims, which evaluation included a "clinical interview," testified that in evaluating the "authenticity" of the victims' reporting,[10] she looked for "emotionality linked to the reporting," "inconsistencies in the reporting," the "amount of anxiety around the reporting," "secondary gains" as a motive to fabricate, and antisocial tendencies. *Id.* at 358–59. The psychologist further addressed specifically whether she observed any of these characteristics in either of the victims, essentially testifying that she observed the "characteristics" of a "child telling the truth" in both victims, as opposed to those characteristics of a child who is fabricating. *Id.* at 360.

[¶ 22] We found that this testimony was directed "to whether the children were 'fabricating' and toward [the psychologist's] search for 'authenticity of the reporting,'" that it was "abundantly clear that she was discussing truthfulness criteria in connection with the victims' reports of the incidents of sexual abuse," and that she "led the jury through her truthfulness evaluation, including her conclusions." *Id.* at 361–62. We also distinguished such testimony from testimony that we previously had found to assist the jury in "understanding some peculiar aspect of the victim's behavior" (i.e. "that most rape victims ask their assailants not to tell anyone about the incident," that "victims often delay in reporting sexual abuse or assault," and that it was "typical behavior" for an adolescent victim not to immediately flee the scene and report the incident). *Id.* at 360–61. We concluded that, considering the circumstances present in *Zabel,* and especially that "the case turned on the question of whether the jury believed the" victims or Zabel, the error amounted to plain error. *Id.* at 362–63.

[¶ 23] In *Wilde,* 2003 WY 93, ¶ 19, 74 P.3d at 709, we found reversible error, "especially given the difficult credibility issues the jury had to assess in [the] case," due to vouching for the victim's credibility in part based on Huylar's testimony. In that case, also involving the same prosecutor as the instant case, Huylar similarly testified regarding her "forensic examination" of two child witnesses, and "emphasized that a part of her interview process is to determine if the child knows what telling the truth is and whether the child is suggestible," and when

> asked by the prosecutor if AM was able to provide a detailed account of the event at issue, Huylar answered that "kids who have been sexually abused will be able to provide those [details]."

*Id.,* 2003 WY 93, ¶ 18, 74 P.3d at 709. Huylar continued that she "gave much weight to the details AM provided, because a child cannot make up that sort of detail." *Id.,* 2003 WY 93, ¶ 18, 74 P.3d at 709. Wilde's trial counsel had "objected to virtually every erroneous question," and the district court sustained several of the objections and "did its level best to keep the prosecutor on track;" nevertheless, "despite several warnings, admonitions, and sustained objections, the prosecutor continued down the path of reversible error." *Id.,* 2003 WY 93, ¶ 19, 74 P.3d at 709.

---

10. The psychologist testified that children who are lying generally exhibit certain characteristics, as do children who are telling the truth. *Zabel,* 765 P.2d at 360.

[¶ 24] The State contends that Huylar's testimony assisted the jury in assessing a child victim's ability to communicate "information consistent with the environment in which the alleged abuse took place" and in understanding Huylar's interview techniques. The State also attempts to equate such testimony with that concerning "the behavioral characteristics of sexual misconduct victims...." According to the State, Huylar "did not opine whether what the child was testifying to was credible," but merely noted "in general, what features might signal authenticity in the story of an interviewee;" therefore, any bolstering of the victim's credibility was incidental.

[¶ 25] We do not agree. The State's contentions mischaracterize Huylar's testimony. Huylar testified that the purpose of her forensic interviews with the victim was for Huylar to assess the credibility of the victim's disclosure regarding what occurred between the victim and appellant. The most critical component to that assessment was whether the victim's interview responses contained sufficient "contextual details" to render the disclosure credible. The nature of this testimony is the very "search for 'authenticity of the reporting'" and "truthfulness criteria" testimony we identified in *Zabel*, 765 P.2d at 361–62. Huylar's testimony as to the significance of the victim's ability to communicate "contextual details" during those interviews is nothing more than Huylar's expert opinion that the victim's disclosure was credible because Huylar, in her expert capacity, was able to discern sufficient "contextual details" based solely on the content of the victim's responses to Huylar's interview questions. Huylar's testimony clearly exceeded even the purposes for which the district court had admitted it.

[¶ 26] We add that the State has not, in the instant case, established to our satisfaction that testimony of this nature assisted the jury in addressing an issue beyond the jurors' "common experience," that such testimony amounted to "objective scientific or specialized knowledge" that assisted the jury in evaluating the victim's testimony or explaining some aspect of the victim's testimony, that such testimony was necessary to disabuse the jury of some widely held misconception about child sexual assault victims, or that such testimony was otherwise relevant to, or helpful in, explaining some factual issue or other contention in the case. *See, for example, Montoya v. State*, 822 P.2d 363, 366–67 (Wyo.1991) and *Griego v. State*, 761 P.2d 973, 979 (Wyo.1988). The district court had already determined that the victim was competent to testify, and the victim did testify at trial. Nothing in either Huylar's testimony, or the portions of a clinical psychologist's testimony that also addressed "truthfulness criteria,"[11] suggests that this kind of testimony would assist the jury in evaluating the victim's credibility any differently from how it would evaluate the credibility of another witness. Expert testimony "concerning the victim's truthfulness would be of no assistance" to the jury. *Montoya*, 822 P.2d at 365. Counsel were capable of arguing, and at least in the instant case, the jury was capable of evaluating, whether the content of the victim's statements contained indicia of reliability in the absence of Huylar's expert testimony.

[¶ 27] It is true that we have previously found that expert testimony

> that discusses the behavior and characteristics of sexual assault victims and the range of responses to sexual assault encountered by experts is admissible. *Scadden v. State*, 732 P.2d 1036 (Wyo.1987).

---

**11.** The clinical psychologist's testimony briefly, and generally, addressed similar "truthfulness criteria," at one point in response to a question posed by appellant's trial counsel, but also in response to the prosecutor's questions. Appellant's trial counsel did not object to this testimony at trial, but did object to the relevance of her testimony at a motion hearing when the prosecutor first disclosed that the psychologist would testify at trial. It does not appear that a formal designation was filed regarding the psycholo-

gist's proposed testimony (or Huylar's for that matter), and at the motion hearing, the prosecutor generally described the nature of that testimony (that general description did not include truthfulness criteria), and the prosecutor informed appellant's counsel that he could contact the witness "and ask her any kind of questions he wants about what her expertise is or what she intends to provide testimony for me on." We merely note that even general testimony of this nature raises the aforementioned concerns.

Such testimony is relevant and helpful in explaining to the jury the typical behavior patterns of adolescent victims of sexual assault. *Griego v. State,* 761 P.2d 973 (Wyo.1988). It assists the jury in understanding some of the aspects of the behavior of victims and, so long as there is no comment on the credibility or truthfulness of the victims, it does not invade the province of the jury. *Zabel v. State,* 765 P.2d 357 (Wyo.1988).

*Rivera v. State,* 840 P.2d 933, 939 (Wyo. 1992), *abrogated on other grounds by Springfield v. State,* 860 P.2d 435 (Wyo.1993). However, in *Zabel,* 765 P.2d at 360–61, we distinguished testimony nearly identical in nature and scope to the referenced testimony in the instant case from testimony we had previously found to assist the jury in "understanding some peculiar aspect of the victim's behavior." The State has similarly failed to establish a sufficient nexus between that testimony and the general symptoms or typical behavior tendencies of child sexual assault victims or a proper diagnosis that the victim had been sexually assaulted. *See, for example, Chapman v. State,* 2001 WY 25, ¶¶ 7–23, 18 P.3d 1164, 1169–74 (Wyo.2001); *Cook,* 7 P.3d at 56–57; *Humphrey v. State,* 962 P.2d 866, 873 (Wyo.1998); *Curl,* 898 P.2d at 373–74; *Frenzel v. State,* 849 P.2d 741, 746 (Wyo. 1993), *cert. denied,* 522 U.S. 959, 118 S.Ct. 388, 139 L.Ed.2d 303 (1997); *Betzle v. State,* 847 P.2d 1010, 1022–23 (Wyo.1993); and *Rivera,* 840 P.2d at 938–39. Rather, Huylar's testimony in the instant case sought to evaluate the credibility of the victim's disclosure based solely on the content of the victim's responses to Huylar's interview questions. *See Griswold v. State,* 994 P.2d 920, 928 (Wyo.1999) and *Rigler v. State,* 941 P.2d 734, 740 (Wyo.1997).

■ [¶ 28] Perhaps equally troubling is the following exchange during the cross-examination of Bilkie, who had served as a law enforcement officer for twenty years and testified immediately after Huylar:

Q. [Appellant's counsel]. That's correct. You had the statements of the [Seward] family indicating that [the victim] disclosed her other grandfather as touching her.

A. Yes, I had allegations from the Seward family that [the maternal grandfather] had done this.

Q. And there was no investigation done on that, basically; correct?

A. Once I clarified and [the victim] positively identified Mr. Seward, there was no other, no other place to go with the investigation. On [the maternal grandfather], there was no other evidence pointing towards him.

Q. Well, let's assume that even if [the victim] was saying Mr. Seward was doing it, she is a young girl and we don't know whether or not those statements were valid, or at least in the time you did this do not know whether or not this occurred or not; correct?

A. I based the credibility of [the victim] on the detail she gave in the interview. And based on experience, yes, I do believe that this happened to her.

Q. Okay, but she's a three-year-old girl.

A. Yes.

Q. Okay, and you didn't know her from Adam before you did this interview; correct?

A. No, but I'm experienced with children giving contextual detail.

The detective's responses certainly exceeded a circumstance where he merely "relied upon the statements in determining that sufficient probable cause existed to arrest" appellant. *See Ogden v. State,* 2001 WY 109, ¶ 29, 34 P.3d 271, 278 (Wyo.2001); *see also Gayler v. State,* 957 P.2d 855, 859–60 (Wyo.1998) (statement that officer "thought the informant was honest with him when they worked together" not opinion that witness was truthful but recommending that such inquiries "be avoided"). Not only did he express an opinion that the victim was credible solely due to the content of her statements, his opinion tied directly into Huylar's expert testimony regarding the amount of "contextual details" contained in the victim's statements. *See Whiteplume v. State,* 841 P.2d 1332, 1339–41 (Wyo.1992).

■ [¶ 29] We conclude that the vouching errors that occurred in the instant case

were harmful. Credibility was the central issue in the case—a close factual dispute existed regarding whether to believe the victim's testimony, or appellant's testimony, as to what occurred during the weekend of November 25, 2000. The evidence of appellant's guilt certainly does not rise to the level of "overwhelming" nor was any physical evidence introduced to support the State's case. Accordingly, because two witnesses essentially vouched directly for the victim's credibility based solely on the content of the victim's disclosure, and considering the prosecutor's utilization of that testimony during closing and rebuttal argument, we find that a reasonable possibility exists that the verdict might have been more favorable to the appellant if the error had never occurred.

### VICTIM'S COMPETENCY

[¶ 30] We will briefly address this issue, but recognize that appellant could potentially raise the issue again on remand in the context of an entirely different record. Appellant contends that the district court erred in finding that the victim was competent to testify at trial. According to appellant, selected portions of the victim's testimony at the competency hearing indicate that the victim did not understand her obligation to testify truthfully, did not have the mental capacity to testify, and was easily distracted. Appellant also argues that the district court's review of Huylar's videotaped interviews with the victim did not "sufficiently address the other possible instances of suggestion presented" by appellant's trial counsel, and that the victim's lack of competency prevented his trial counsel from effectively cross-examining the victim at trial.

The Wyoming Rules of Evidence provide that "[e]very person is competent to be a witness except as otherwise provided in these rules." W.R.E. 601. "A person is generally competent to testify if he can understand, receive, remember and narrate impressions and is sensible to the obligations of the oath taken before testifying." *English [v. State]*, 982 P.2d [139] at 145 [ (Wyo.1999) ] (citing *Simmers [v. State]*, 943 P.2d [1189] at 1199 [ (Wyo. 1997) ] ); *Larsen v. State*, 686 P.2d 583, 585 (Wyo.1984). "Intelligence, not age, is the guiding criteria in determining the competency of a witness." *Baum v. State*, 745 P.2d 877, 879 (Wyo.1987). "It is a well-established principle of law that competency of witnesses to testify is a question within the sound discretion of the trial court." *English*, 982 P.2d at 145. "However, when children are called into the courtroom to testify, we have held that once the child's competency is called into question by either party, *it is the duty of the court* to make an independent examination of the child to determine competency, and that determination will not be disturbed unless shown to be clearly erroneous." *Id.*

We have directed the district courts to use a five-part test for determining the competency of child witnesses:

> "(1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it."

*Id.; Larsen*, 686 P.2d at 585 (quoting *State v. Allen*, 70 Wash.2d 690, 424 P.2d 1021 (1967)).

In *English*, we decided that the existing state of the law adequately addresses pretrial taint concerns and a pretrial taint hearing is not necessary. At the time of a child's competency hearing, a defendant can argue memory taint at that hearing to discredit the reliability of a child's testimony. We held that if a defendant can establish a child's memory of events has been corrupted by improper interviews, it is possible the third *Larsen* factor, "a memory sufficient to retain an independent recollection of the occurrence," may not be satisfied. *English*, 982 P.2d at 146.

Although we declined to adopt a separate pretrial "taint hearing" procedure, we did, however, endorse the use of the fol-

lowing factors as they relate to the question of independent recollection. *Id.*

"The factors that should be considered in assessing the reliability of a complaint regarding sexual offenses are: '(1) the age of the victim; (2) circumstances of the questioning; (3) the victim's relationship with the interrogator; and (4) the type of questions asked.' * * * Undue suggestiveness can occur when an interviewer has a preconceived notion of what has happened to a child, the interviewer uses leading questions, the interviewer is a trusted authority figure, the person accused of wrongdoing is vilified during the interview, or the interviewer uses threats or rewards to pressure the child."

*Id.* (quoting *State v. Scherzer*, 301 N.J.Super. 363, 694 A.2d 196, 245–46 (1997)) (summarizing and quoting *State v. Michaels*, 136 N.J. 299, 642 A.2d 1372, 1377–1383 (1994)).

*Billingsley v. State*, 2003 WY 61, ¶¶ 10–13, 69 P.3d 390, 395–96 (Wyo.2003) (emphasis in original).

[¶ 31] The district court held a competency hearing the first day of trial.[12] At the hearing, the district court heard testimony from the victim, in addition to having previously reviewed the videotapes of Huylar's interviews with the victim. The district court concluded that the victim "clearly" met the referenced competency criteria. It found that the victim "clearly understood the difference between the truth and untruth," that she had the requisite mental capacity and there was "no indication to the contrary," that she had the ability to "retain an independent recollection" and the "capacity to express in words the memory of the occurrence, and the capacity to understand simple question[s] about it from both Prosecutor and Defense Counsel." The district court also found that Huylar's videotaped interviews did not contain "improperly suggestive

questions of or statements to" the victim. [*Id.* at 127]

[¶ 32] We cannot say that, based on the record before it, the district court erred in finding the victim competent to testify at trial. The district court applied the requisite factors to that record and made specific findings. We

do not presume to place ourselves in the shoes of the trial court in these cases by reading a cold record. The trial court sees the witness' facial expressions, hears inflections in her voice and watches her mannerisms during examination. These observations are a vital part of the ultimate ruling on competency.

*In Interest of CB*, 749 P.2d 267, 271 (Wyo. 1988). During her testimony as a whole, the victim was able to differentiate between the truth and a lie by way of specific examples and negative consequences associated with lying, even during questioning by appellant's trial counsel. She also was able to state her age, birth date, age at previous and next birthdays, name, family members, who she lived with, identified appellant, the state in which she lived, and counted accurately to twelve but inaccurately thereafter. It is worth noting that at trial, the victim was able to articulate and testify regarding her version of what happened to her in addition to utilizing anatomically correct drawings.

[¶ 33] Appellant claims that the district court somehow prevented appellant from adequately exploring "taint" issues at the competency hearing. The record does not support this contention. At a motion hearing earlier in the case, appellant's trial counsel mentioned three areas in which the victim's disclosure might have been tainted: evidence regarding a potential custody dispute between the victim's mother and father, evidence pointing to the victim's maternal grandfather as the perpetrator, and evidence of improper influence during the videotaped

---

**12.** The manner in which the competency hearing began is rather concerning:

[Prosecutor]: Okay. Can you tell us your whole name?

[Victim]: Uh-huh.

[Appellant's trial counsel]: Your Honor, I guess before we proceed, I just want the Rec-

ord to note that the Witness is sitting on the Prosecutor's lap, and I would ask that she not do that.

[Prosecutor]: Can you sit on the Witness Chair for me, Baby? Okay?

interviews Huylar conducted. Yet, during the motion hearing, the district court specifically referred to Barbee's potential testimony in this respect, stated that it would "look into the issues" and "if necessary, counsel may inquire of Lynn Huylar and Officer Bilk[ie]," and indicated that it would hold a competency hearing at a later date. These witnesses could have provided information addressing the very three areas that appellant identified at the motion hearing (based on his trial testimony, Detective Bilkie would have been able to provide testimony regarding the maternal grandfather as the perpetrator).

[¶34] The district court reviewed the videotaped interviews involving Huylar and the victim (appellant does not contest the district court's finding regarding these interviews) prior to the competency hearing, received the victim's testimony at the competency hearing, and made its findings based on the record before it. Nothing in the record indicates that appellant's trial counsel ever attempted to call, or requested that the district court receive testimony from, any other witness at the competency hearing. In fact, other than summarily objecting to the district court's competency ruling, appellant's trial counsel made no argument regarding these taint issues at the competency hearing.

[¶35] The record similarly does not support appellant's argument as to whether the victim's competence interfered with his ability to cross-examine her.

EXCLUSION OF PRIOR INCONSISTENT STATEMENT TESTIMONY

[¶36] Appellant asserts that the district court abused its discretion in excluding testimony offered to impeach the victim's mother with a prior inconsistent statement. During the cross-examination of Barbee, appellant's trial counsel elicited the following testimony:

Q. . . . You moved out of your family's house because you had troubles with your father; is that correct?

A. Yes.

Q. And he's actually your stepfather; is that right?

A. Yes.

. . .

Q. Okay. And you had explained to Matt [the victim's father] and the family that it was because of your father; is that correct?

A. Yes.

Q. And you also shared with Matt and his, his family that he had abused you; is that correct?

A. Me and him had gotten into a fist fight once, and that's the only time he has abused me.

Q. Okay. Did you ever tell Mike Seward that you had been abused by him?

A. No.

Q. Did you ever tell him that you had been sexually abused by him?

A. No.

Appellant's trial counsel called appellant's son, Mike Seward, as a witness, and the following transpired during direct examination:

Q. Have you had conversations with [Barbee] concerning her past?

A. Yes, I have.

Q. Okay, and specifically with her grandfather, about her grandfather on her side?

A. Well, her father on her side, yes.

Q. Father. Excuse me. What transpired in those conversations?

The prosecutor objected as to relevance. Appellant's trial counsel responded that the witness' testimony would rebut Barbee's testimony. The district court sustained the prosecutor's objection. Appellant's trial counsel provided the district court an offer of proof regarding the witness' proposed testimony that he and Barbee were watching television, and "something came on the TV about [a] child molester, or it was something along those lines," and Barbee stated that "she couldn't stand her father either because he used to do the same thing to her." The district court stated that the testimony was "collateral" to the issues in the case and "404(b) evidence called against a person who is not charged and isn't here . . . ."

[¶37] Should this issue arise on remand, we note that, while the district court retains its discretion regarding the admissi-

bility of evidence, we have recently stated the following with respect to such testimony when offered for impeachment purposes:

Prior inconsistent statements are admissible under W.R.E. 613(b) to impeach by contradiction a witness' trial testimony. W.R.E. 613(b) provides: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require." This rule applies when two statements—one made at trial and one made previously—are irreconcilably at odds. In such event, counsel is permitted to show the discrepancy by extrinsic evidence, if necessary. *United States v. Winchenbach*, 197 F.3d 548, 558 (1st Cir. 1999). The purpose of this type of impeachment evidence is to show a witness to be generally capable of making errors in his testimony. 3A John Henry Wigmore, Evidence § 1017 (Chadbourn rev.1970). In doing so, counsel can resort to the witness' own prior statements in which that witness has given a contrary version. *Id.*

Prior statements made by a witness are not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statements. W.R.E. 801(d)(1). The use of a prior inconsistent statement is not inadmissible hearsay because it is not offered for the truth of the matter asserted. Rather, it is used as a tool to compare both statements and conclude that the declarant has erred in making one or the other without determining which statement is erroneous. 3A John Henry Wigmore, Evidence § 1018 (Chadbourn rev.1970).

*Willis v. State*, 2002 WY 79, ¶¶ 18–19, 46 P.3d 890, 896 (Wyo.2002). However, the jury should ultimately consider such testimony in accordance with the limited purpose for which it is offered. *See, for example, Medrano v. State*, 914 P.2d 804, 810 (Wyo.1996) and *Channel v. State*, 592 P.2d 1145, 1149–50 (Wyo.1979).

[¶ 38] In evaluating whether the proffered testimony was indeed "collateral," the district court might consider whether such testimony was "relevant to some issue in the case *other than* credibility. . . ." *Daniel v. State*, 923 P.2d 728, 739 (Wyo.1996) (emphasis in original). Barbee's credibility certainly was at issue, and one of appellant's theories was that Barbee had a motive to influence the victim based on Barbee's desire that the victim's father relinquish his parental rights. Appellant also advanced a theory that the victim's maternal grandfather was the perpetrator. Appellant, and several witnesses from appellant's family, testified that the victim referred to her maternal grandfather perpetrating the acts alleged. Bilkie also testified that he checked the maternal grandfather's history and found "one incident," and that Barbee denied that the maternal grandfather perpetrated any acts against her. We make no comment as to whether the proffered testimony was probative of that, or some other issue in the case, but merely state that the district court should consider any such issues in deciding on remand whether the proposed brief testimony is collateral and would unduly confuse the issues at trial.

[¶ 39] We reverse.